# Illinois Official Reports

## Appellate Court

*People v. Wilson*, 2017 IL App (1st) 143183

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JOHN WILSON, Defendant-Appellant. |
| District & No. | First District, Sixth Division<br>Docket No. 1-14-3183 |
| Filed | September 22, 2017 |
| Rehearing denied | October 13, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 11-CR-20319; the Hon. John Joseph Hynes, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Michael J. Pelletier, Patricia Mysza, and Chan Woo Yoon, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Annette Collins, Amy Watroba, and Whitney Bond, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE DELORT delivered the judgment of the court, with opinion.<br>Presiding Justice Hoffman and Justice Connors concurred in the judgment and opinion. |

**OPINION**

¶ 1     After a jury trial, defendant John Wilson was convicted of first degree murder, armed robbery, home invasion, and residential burglary. On appeal, he contends that the State introduced DNA evidence against him that lacked an adequate foundation. He also argues that he received ineffective assistance of counsel because his attorney failed to (1) request a *Frye* hearing regarding the State's historical cell site analysis evidence and (2) object when the court tendered a general verdict form for first degree murder to the jury. We affirm.

¶ 2                                         BACKGROUND

¶ 3     At trial, the State presented testimony from 45 witnesses. Most of this testimony is not relevant to the issues raised by defendant. Thus, in the interest of brevity, we summarize only that testimony most germane to the issues presented.

¶ 4     On the morning of October 27, 2011, Brenda O'Laughlin left her home in Indian Head Park, Illinois, and went to work. When she returned home shortly before 5 p.m., she saw blood and a knife in the family room, and her daughter, Kelli O'Laughlin, lying facedown on the floor in the kitchen. Brenda called 9-1-1. When paramedics arrived, they performed CPR on Kelli and took her to the hospital, where she was pronounced dead.

¶ 5     While the paramedics treated Kelli, Sergeant Raymond Leuser, a police officer with the Indian Head Park police department, entered the home and walked into the dining room, where he saw a broken window and glass on the floor. Sergeant Leuser searched the rest of the home and then alerted the South Suburban Major Crimes Task Force.

¶ 6     Officer Ronald Sachtleben testified that he worked for the Cook County Sheriff's police department as an investigator for the criminalistics unit. His job was to process and document crime scenes. Officer Sachtleben arrived at the O'Laughlin home shortly before 6 p.m. on October 27, 2011. To preserve evidence, he wore latex gloves and protective shoe coverings.

¶ 7     During his investigation, Officer Sachtleben observed a red-knit hat containing a rock lying on the floor underneath a dining room chair. Officer Sachtleben took pictures of the hat and rock and "recovered" the hat. At trial, he viewed the hat and rock and testified that both items were in the same or substantially same condition as when he recovered them.

¶ 8     Defendant was arrested on November 2, 2011, and taken to the LaGrange police department for processing. There, Officer Sachtleben met with defendant and took a buccal swab from him. Officer Sachtleben testified that after taking the buccal swab, he packaged the sample, sealed it, and turned it over to Detective Wodka, another member of the task force.

¶ 9     Michael Matthews, a forensic scientist with the Illinois State Police, testified that he performed forensic analysis on the red hat. Matthews stated that the hat was in a sealed bag when he received it. He explained that he swabbed the inside of the hat and used scissors to remove the section of the hat that would have been in contact with Wilson's forehead to preserve it for further testing. At trial, Matthews viewed the hat and testified that it was in the same or substantially same condition as when he worked on it.

¶ 10    Lynette Wilson, a forensic scientist with the Illinois State Police, testified that she performed a PCR/STR DNA analysis on the red hat. She explained that "PCR" stood for "polymerase chain reaction," a method of copying specific locations on a piece of DNA for

comparison, and that "STR" stood for "short tandem repeats," *i.e.*, "the specific locations on the DNA" that are used for comparison. She described the process of DNA analysis as follows:

> "The first step in my analysis is what I call extraction. Basically it's where I add chemicals to a stain to release the DNA from the cells in the stain. I also purify the DNA. And then after that, after isolating the DNA, I then measure how much I have and verify that it's of human origin.
>
> Then at that point I am usually working with small amounts of DNA, so it's then necessary to copy the amount that I have, and that's that PCR process I mentioned earlier. Basically, it's like copying a document on a Xerox machine. I copy the DNA until I have enough that I can detect a profile.
>
> So after I amplify the DNA, I add a little bit to an instrument which will determine the DNA profile for me.
>
> * * *
>
> *** I then compare the DNA profile from an evidence stain to the DNA profile from a suspected donor to that stain."

¶ 11    Wilson testified that she received the swab and cutting from the red hat and performed DNA analysis on both items, which revealed the presence of DNA from two people. Wilson then identified "a major human male DNA profile." Wilson compared that profile to a DNA profile of defendant and determined that the major DNA profile from the red hat "matched the DNA profile of [defendant]." Wilson then "calculated the statistics that shows how often that profile would be expected to be seen in the population." She found that the major DNA profile on the red hat "would be expected to occur in approximate 1 in 4.5 quintillion black, 1 in 300 quintillion white, or [1] in 150 quintillion Hispanic unrelated individuals." Wilson stated that her opinions were "to a reasonable degree of scientific certainty."

¶ 12    FBI Agent Joseph Raschke testified as an expert in the field of historical cell site analysis (HCSA). Agent Raschke testified that when cell phones are used to make calls, phone companies keep records of the date and time of the call, the phone numbers involved, the duration of the call, and "which cell towers that phone was communicating with for that call." Agent Raschke explained that HCSA consists of the analysis of these records "to determine an approximate location for where a cell phone was at a particular date and time." In addition, Agent Raschke explained that a cell phone's location may be determined using "forced location registration." He explained that a forced location registration occurs when the phone company "forces the phone to *** disclose it's [*sic*] location either by a GPS signal or by making contact with the nearby cell towers so that a location can be triangulated."

¶ 13    Using records from Sprint (for Kelli's phone) and Cricket Wireless (Cricket) (for defendant's phone), Agent Raschke created a map showing the general location and movement of Kelli's and defendant's cell phones throughout October 27 and 28, 2011. According to his analysis, at 12:01 a.m. on October 27, defendant's phone used a Cricket tower that was near his residence at 7950 South Lafayette Avenue in Chicago. At 1:52 p.m., defendant's phone used a Cricket tower in Indian Head Park to place a call to Karen Yoch, a real estate broker who had a home listed for sale in Western Springs, Illinois.

¶ 14    At 3:22 p.m., defendant's phone participated in two calls that utilized Cricket tower 605. Agent Raschke explained that Kelli's home was inside tower 605's coverage sector. At 3:41 p.m., Kelli's phone placed an outgoing call that utilized Sprint tower 277. Agent Raschke

explained that Sprint tower 277 was located in a lot with "multiple pieces of cellular equipment," including Cricket tower 605, which he stated was "right next to" Sprint tower 277.

¶ 15 On October 28 at 12:26 p.m., Kelli's phone placed a call that utilized a Sprint tower near 637 East Woodland Park Avenue in Chicago, where one of defendant's friends lived. At 12:27 p.m., Kelli's phone was "pinged," revealing that it was near 637 East Woodland Park Avenue. One minute later, defendant's cell phone placed a call that utilized a Cricket tower in the vicinity of 637 East Woodland Park Avenue. Based on this data, Agent Raschke concluded that defendant's cell phone and Kelli's cell phone were "in close proximity to each other."

¶ 16 At 3:49 p.m., defendant's cell phone placed a call that utilized a Cricket tower that was two blocks east of 11557 South Yale Avenue in Chicago. Three minutes later, Kelli's phone was "pinged," revealing within an accuracy radius of 20 meters that it was near 11557 South Yale Avenue. At 4:27 p.m., defendant's phone made another call using the same tower. Four minutes later, Kelli's phone was pinged, which again revealed that it was near 11557 South Yale Avenue. According to Agent Raschke, this data indicated that both phones were "in a similar location."

¶ 17 At 11:29 p.m., defendant's phone used a Cricket tower near Bryn Mawr Avenue and Lakeshore Drive in Chicago. At 2:11 a.m. on October 29, 2011, Kelli's phone was pinged, revealing that it, too, was in an area near Bryn Mawr Avenue and Lakeshore Drive in Chicago. Agent Raschke explained that this data indicated that both phones "moved from the far south side of Chicago and are now up on the North side of Chicago." Ultimately, Agent Raschke opined "to a reasonable degree of certainty" that from 3:30 p.m. on October 27, 2011, to October 29, 2011, both phones were "consistently located in the same general vicinity."

¶ 18 During the instruction conference, the State propounded a first degree murder instruction, which articulated three theories of culpability: intentional, knowing, and felony murder. The felony murder portion of the instruction alleged that defendant performed the acts which caused Kelli's death while committing an armed robbery, home invasion, or residential burglary. The State also propounded a general verdict form for first degree murder. Defendant did not object to the verdict form, and the court tendered it to the jury.

¶ 19 After deliberations, the jury found defendant guilty of first degree murder, armed robbery, home invasion, and residential burglary. The court sentenced defendant to 160 years' imprisonment, which included a 100-year term for first degree murder and two consecutive 30-year sentences for armed robbery and home invasion. This appeal followed.

¶ 20                                        ANALYSIS

¶ 21 We first consider defendant's claim that he is entitled to a new trial because the State introduced DNA evidence against him without establishing a proper foundation. This argument proceeds in two parts. First, defendant maintains that the DNA evidence should not have been admitted because the State failed to present a sufficient chain of custody for the red hat. Second, defendant argues that the DNA evidence lacked sufficient foundation because Wilson did not explain the methodology behind her conclusion that the major DNA profile on the red hat matched defendant's DNA profile.

¶ 22 The first prong of defendant's foundation argument is forfeited. To preserve an issue for appeal, a defendant must object at trial and raise the issue in his posttrial motion. The failure to do so results in forfeiture. *People v. Belknap*, 2014 IL 117094, ¶ 47. Forfeiture is important not

only because a timely objection allows a trial court to promptly correct error, but also to prevent a party from strategically obtaining a reversal by their failure to act. *People v. Roberts*, 75 Ill. 2d 1, 11 (1979). "[F]orfeiture in cases such as this is particularly appropriate because, where the defendant fails to object to the foundation of evidence at trial, the State misses its opportunity to cure any error." *People v. Banks*, 2016 IL App (1st) 131009, ¶ 71. Defendant did not object to the State's DNA evidence at trial, nor did he raise this issue in his posttrial motion. As a result, defendant deprived the State of any reasonable opportunity to correct the alleged errors in the chain of custody evidence it presented at trial. *Id.* We must honor defendant's forfeiture.

¶ 23     Defendant nonetheless asserts that we may review this claim as plain error. The plain-error doctrine is codified in Illinois Supreme Court Rule 615(a), which states, "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court." Ill. S. Ct. R. 615(a). Plain errors may be noticed when a "clear or obvious error occurred" and "the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error," or if the error is "so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). A defendant raising a plain-error argument bears the burden of persuasion. *People v. Thompson*, 238 Ill. 2d 598, 613 (2010).

¶ 24     "[A] challenge to the chain of custody is an evidentiary issue that is generally subject to waiver on review if not preserved by defendant's making a specific objection at trial and including this specific claim in his or her posttrial motion." *People v. Woods*, 214 Ill. 2d 455, 471 (2005). However, in *Woods*, the supreme court held that "under limited circumstances a challenge to the chain of custody may be properly raised for the first time on appeal if the alleged error rises to the level of plain error." *Id.* The court explained that a plain-error challenge to may be viable "in those rare instances where a complete breakdown in the chain of custody occurs *** raising the probability that the evidence sought to be introduced at trial was not the same substance recovered from defendant." *Id.*

¶ 25     Of course, there can be no plain error if there were no error at all. Accordingly, "[t]he first step of plain-error review is determining whether any error occurred." *Thompson*, 238 Ill. 2d at 613. Accordingly, we begin by considering whether the State established an adequate foundation for the red hat. "When the State seeks to introduce an object into evidence, the State must lay an adequate foundation either 'through its identification by witnesses or through a chain of possession.' " *Woods*, 214 Ill. 2d at 466 (quoting *People v. Stewart*, 105 Ill. 2d 22, 59 (1984)). "If an item is 'readily identifiable and [has] unique characteristics, and its composition is not easily subject to change,' the party may elicit testimonial evidence showing that the item 'is the same item recovered and that it is in substantially the same condition as when it was recovered.' " *Banks*, 2016 IL App (1st) 131009, ¶ 69 (quoting *Woods*, 214 Ill. 2d at 466).

¶ 26     By contrast, "[f]or items that are fungible or susceptible to tampering, contamination, or exchange, the State must establish a chain of custody that is sufficiently complete to make it improbable that the evidence has been subject to tampering or accidental substitution." *People v. Trice*, 2017 IL App (1st) 152090, ¶ 61. Generally, Illinois courts have identified three types of evidence that fall within this category: drug evidence (*People v. Irpino*, 122 Ill. App. 3d 767, 773 (1984) (State required to established chain of custody to admit bag of cocaine into evidence)), ballistic evidence (*People v. Smith*, 2014 IL App (1st) 103436, ¶ 46 (holding that a

- 5 -

bullet recovered from a victim's body and cartridge cases recovered from a home were not "readily identifiable or unique items")), and biological evidence (*People v. Lach*, 302 Ill. App. 3d 587, 594 (1998) (in DUI prosecution, State was required to establish chain of custody for blood sample taken from defendant)).

¶ 27    On the other hand, this court has held that articles of clothing are not fungible or susceptible to tampering. See *People v. Morris*, 2013 IL App (1st) 111251, ¶¶ 90-92 (State was not required to establish chain of custody for pair of bloodstained jeans). *Morris* is particularly informative to the issue at hand in this case. In *Morris*, the defendant was charged with first degree murder. When he was arrested, he was wearing bloodstained clothing. *Id.* ¶ 3. At trial, a forensic scientist testified that DNA found on a sample of the blood from defendant's clothing matched the victim's DNA profile. *Id.* On appeal, the defendant argued that the State did not establish a sufficient chain of custody for the clothing. This court rejected that argument, explaining:

> "While a sample of blood in itself may require a sufficient chain of custody for admissibility, the blood in the instant case was contained on unique articles of clothing that were identified by several witnesses at trial. Once the blood samples were recovered from the clothing, then they were subject to the chain-of-custody procedures used for samples of biological material." *Id.* ¶ 91

¶ 28    In the present case, the State showed Officer Sachtleben the red hat that he recovered from the O'Laughlin home. He testified that the hat was in the same or substantially same condition as it was in when he recovered it on October 27, 2011. That testimony was sufficient to lay adequate foundation for the hat, notwithstanding the fact that defendant's DNA was ultimately found on the hat. See *id.*; see also *People v. Span*, 2011 IL App (1st) 083037, ¶ 75 (where State obtained fingerprint evidence from a bag of potato chips, State was not required to establish chain of custody for the bag of potato chips). Because the State established an adequate foundation for the red hat, no error occurred and defendant's plain-error argument fails.

¶ 29    Defendant's reliance on *People v. Rogers*, 42 Ill. App. 3d 499 (1976), and *People v. Winters*, 97 Ill. App. 3d 288 (1981), is unavailing. The issue in *Rogers* was whether the State laid an adequate foundation for a pair of bloodstained shorts that belonged to the victim of an aggravated battery, and which were removed from the victim by hospital personnel. At trial, the victim's mother testified that the shorts belonged to the victim. This court held that the State failed to lay an adequate foundation for the shorts. *Rogers*, 42 Ill. App. 3d at 502. But contrary to defendant's argument, the court did not so hold because the shorts contained blood. Rather, the court found that the State failed to introduce any evidence showing that the shorts the State sought to introduce at trial were the same shorts taken by hospital personnel. *Id.* at 501. Accordingly, *Rogers* is irrelevant to the issues in the present case.

¶ 30    In *Winters*, the defendant was convicted of murder. At trial, a doctor with the Cook County medical examiner's office testified that he took a blood sample from the victim. The doctor identified the vial of blood at trial. Later, an analyst with the Chicago Crime Laboratory identified the vial of blood and stated that it was in the same condition as when he received it. During cross-examination, however, the analyst testified that the vial was not sealed when he received it. On appeal, the defendant argued that the State failed to establish a sufficient chain of custody for the blood vial. This court agreed, explaining:

> "[E]vidence in the case at bar established that the vial of blood was not sealed when the microanalyst received it and there was no testimony from [the medical examiner] that

the vial had been sealed after the blood sample was placed in it. Since the blood sample was not sealed, we cannot say that in all reasonable probability the evidence had not been changed in any important respect." *Winters*, 97 Ill. App. 3d at 296.

¶ 31　　Unlike here, the vial of blood drawn from a murder victim in *Winters* was highly fungible and thus subject to the chain of custody requirement. *Morris*, 2013 IL App (1st) 111251, ¶ 91; *Lach*, 302 Ill. App. 3d at 594. By contrast, as we explained above, the red hat in the present case was readily identifiable. *Winters*, therefore, does not require a different result.

¶ 32　　In any event, the outcome would be the same even if the red hat was subject to the chain-of-custody requirement. To establish error in the State's chain of custody in the plain-error context, a defendant must show that there was a "complete breakdown" in the chain of custody. *Woods*, 214 Ill. 2d at 471-72. This is a formidable standard. See *People v. Smith*, 2014 IL App (1st) 103436, ¶ 53 (on plain-error review, the court rejected defendant's claim that chain of custody was insufficient, despite there being "substantial gaps" in the chain of custody). *People v. Echavarria*, 362 Ill. App. 3d 599 (2005), illustrates the point. The issue in *Echavarria* was whether the State established sufficient chain of custody for a bag of cocaine that a police officer recovered from the defendant's pocket. At trial, the State did not present testimony about what the recovering officer did with the cocaine, how the cocaine arrived in the possession of a State Police inspector, or how the cocaine ultimately ended up in a sealed evidence bag. *Id.* at 607-08. Despite these gaps, this court concluded that the State's chain-of-custody evidence "met the minimum standard enunciated in *Woods*." *Id.* at 608.

¶ 33　　We similarly find that the State's evidence in this case met the *Woods* standard. The State presented evidence showing that (1) Officer Sachtleben recovered the hat; (2) afterwards, the hat arrived in sealed condition at Matthews's lab; and (3) the swabbing and cutting from the hat that Matthews took was subsequently received and analyzed by Wilson. Though we would be hard-pressed to find this constitutes an exhaustive chain of custody, it is abundantly clear from the record that there was not a complete breakdown in the chain of custody. Accordingly, defendant's plain-error argument fails.

¶ 34　　Defendant also argues that his attorney was ineffective for failing to raise a foundational challenge to the hat's admissibility. Because the State established a sufficient foundation for the hat, an objection would have been futile. Accordingly, defendant's ineffective assistance of counsel claim is meritless. *People v. Holmes*, 397 Ill. App. 3d 737, 745 (2010) ("It is axiomatic that a defense counsel will not be deemed ineffective for failing to make a futile objection.").

¶ 35　　Moreover, because the State met its burden of showing an adequate chain of custody, defendant had the burden "to show *actual evidence* of tampering, alteration or substitution." (Emphasis added.) *People v. Alsup*, 241 Ill. 2d 266, 275 (2011). Defendant's argument falls far short of this threshold. He claims that because Officer Sachtleben is "the only known officer who handled the red hat" and also took defendant's buccal swab, it is "certainly possible" that Officer Sachtleben "contaminated the hat with [defendant's] DNA." That argument is nothing more than speculation and cannot support defendant's claim for relief. *People v. Williams*, 139 Ill. 2d 1, 12 (1990) (holding that "speculative allegations and conclusory statements" are not sufficient to establish ineffective assistance of counsel); *People v. Trice*, 2017 IL App (1st) 152090, ¶ 60 (rejecting chain-of-custody argument because the defendant "failed to carry his burden of showing actual evidence of tampering, alteration, or substitution"). Moreover, this argument is belied by the record: Officer Sachtleben testified that he took the buccal swab on November 2, 2011—six days after recovering the hat—at a different police station than where

he worked, and he stated that he sealed the buccal swab sample after taking it. Based on these facts, it is unlikely that the circuit court would have sustained a foundational challenge to the hat's admissibility. See *Smith*, 2014 IL App (1st) 103436, ¶ 64 (rejecting similar claim because "[n]othing in the record suggest[ed] that counsel had evidence that would undermine the chain of custody for the bullet"). As a result, defendant's ineffective assistance of counsel claim fails.

¶ 36    We next consider defendant's argument that the State's DNA evidence lacked an adequate foundation because Wilson did not explain how she came to the conclusion that the major DNA profile on the red hat matched defendant's DNA profile. Specifically, defendant maintains that, although Wilson explained what the "PCR" component of PCR-STR DNA consists of, she failed to provide any description whatsoever of the "STR" component. As with his first argument, defendant did not raise this issue by objecting at trial, nor did he raise this issue in his posttrial motion. Accordingly, this issue is forfeited.

¶ 37    Seeking to avoid the result of his forfeiture, defendant again invokes the plain-error doctrine. Citing *People v. Jones*, 2015 IL App (1st) 121016, and *People v. Safford*, 392 Ill. App. 3d 212 (2009), defendant contends that for Wilson's testimony to be properly admitted, the State was required to establish that the information upon which Wilson based her opinion is reliable. In further reliance on these authorities, defendant argues that the State's failure to elicit testimony from Wilson, explaining how she performed the STR portion of her analysis, infringed his rights under the confrontation clause because it denied him the opportunity to subject Wilson to "meaningful cross-examination." This argument is unpersuasive.

¶ 38    In *Wilson v. Clark*, 84 Ill. 2d 186 (1981), the Illinois Supreme Court adopted Federal Rule of Evidence 705, which then provided that " '[t]he expert may testify in terms of opinion or inference and give his reasons therefor without prior disclosure of the underlying facts or data, unless the court requires otherwise. *The expert may in any event be required to disclose the underlying facts or data on cross-examination.*' " (Emphasis added.) *Wilson*, 84 Ill. 2d at 194 (quoting Fed. R. Evid. 705). The court explained that, "[u]nder Rule 705 the burden is placed upon the adverse party during cross-examination to elicit the facts underlying the expert opinion." *Id.* This rule has prevailed in Illinois ever since, in civil and criminal cases alike. See *People v. Williams*, 238 Ill. 2d 125, 140 (2010), *aff'd*, *Williams v. Illinois*, 567 U.S. 50 (2012); *People v. Shaw*, 133 Ill. App. 3d 391, 403 (1985). Moreover, in January 2011, the Illinois Rules of Evidence became effective, including Illinois Rule of Evidence 705, which is identical to the version of Federal Rule of Evidence 705, adopted by the supreme court in *Wilson*. See Ill. R. Evid. 705 (eff. Jan. 1, 2011). In light of these authorities, we reject defendant's argument that Wilson's testimony lacked foundation because the State failed to elicit testimony from Wilson explaining how she performed the STR component of her DNA analysis.

¶ 39    Neither *Jones* nor *Safford* require a different result. To begin, defendant's citation to *Jones* is inappropriate. This court issued its opinion in *Jones* in August 2015. In October 2015—nearly a year before defendant filed his appellate brief—the Illinois Supreme Court vacated the judgment in *Jones*. See *People v. Jones*, No. 119826 (Ill. Oct. 26, 2015) (supervisory order). As a result, the judgment in *Jones* "has no effect." *People v. Simmons*, 2016 IL App (1st) 131300, ¶ 116.

¶ 40    Defendant's reliance on *Safford* is equally unavailing. In *Safford*, a latent print examiner testified, without explaining "how or why he arrive[d] at his conclusions," that he identified a fingerprint match. *Safford*, 392 Ill. App. 3d at 217. A panel of this court held that the expert's

testimony was inadmissible because he did not disclose the basis of his opinion. *Id.* at 226. The court was explicitly concerned with the defendant's ability to cross-examine the expert. Relying on *People v. Anderson*, 113 Ill. 2d 1 (1986), the court stated, "the underlying basis of an expert's opinion must be subject to cross-examination in order to allow the jury to properly evaluate that expert's testimony. If the foundation for the expert's opinion is not subject to scrutiny, the jury may ascribe an 'aura of reliability and trustworthiness' to the expert's conclusion." *Safford*, 392 Ill. App. 3d at 226.

¶ 41   Since it was decided, multiple panels of this court have declined to follow *Safford*. See, *e.g.*, *Simmons*, 2016 IL App (1st) 131300, ¶ 124 ("[L]ooking to *Safford* itself, we conclude that its analysis was flawed. While the court in *Safford* cited the principle that the information on which an expert bases his opinion must be reliable [citation], it did not correctly analyze that principle."); *People v. Negron*, 2012 IL App (1st) 101194, ¶ 41 ("We underscore the fact that *Safford* is an outlier case and no reported case since then has held that there must be a minimum number of points of fingerprint comparison or a disclosure of a specific number of points of similarity found by the expert."). We likewise decline to follow *Safford*.

¶ 42   First, the *Safford* court misapplied *Anderson*. That case had nothing to do with the confrontation clause or the foundation requirement for the admissibility of expert testimony. Rather, in *Anderson* the supreme court simply held that the rule against hearsay does not prohibit a defense expert, during direct examination, from disclosing the basis of his opinion by referring to information contained in a report. *Anderson*, 113 Ill. 2d at 11-12. Second, the *Safford* court's ultimate holding—namely, that to establish an adequate foundation for an expert opinion, the expert must testify to the factual basis for the opinion on direct examination—runs counter to *Wilson*, *Williams*, and Rule 705, all of which stand for the basic proposition that the basis of an expert's opinion is a matter for cross-examination. See *Williams*, 238 Ill. 2d at 140 ("[T]he burden is placed upon the adverse party during cross-examination to elicit facts underlying the expert opinion."). Accordingly, we decline to follow *Safford*.

¶ 43   Because the basis of Wilson's opinion was a matter for cross-examination, Wilson's failure to disclose it on direct examination did not undermine the foundation of her testimony. As such, the circuit court did not err by admitting Wilson's testimony. Defendant's plain-error argument therefore fails.

¶ 44   Defendant also contends that his counsel was ineffective for failing to object on the ground that Wilson did not disclose the basis of her opinion. This argument fails for two reasons. First, for the reasons discussed above, the objection would have been futile. Second, the decision not to object or pursue this issue on cross-examination was likely a strategic decision. *People v. Tolefree*, 2011 IL App (1st) 100689, ¶ 34 ("The decision of whether and how to conduct a cross-examination is generally a matter of trial strategy, which cannot support a claim of ineffective assistance of counsel."). Had trial counsel successfully objected, the State would have had to elicit additional testimony from Wilson about the specific scientific basis for her opinion, which could have bolstered her strength and credibility in the eyes of the jury. For these reasons, defendant cannot show that trial counsel's performance was constitutionally deficient.

¶ 45   We next consider defendant's argument that trial counsel was ineffective for failing to request a *Frye* hearing (see *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923)) to determine if the underlying methodology for Agent Raschke's HCSA is generally accepted in its field. "In

Illinois, scientific evidence is admissible at trial only if it meets the standard expressed in *Frye*, which dictates that 'scientific evidence is admissible at trial only if the methodology or scientific principle upon which the opinion is based is sufficiently established to have gained general acceptance in the particular field in which it belongs.' " (Internal quotation marks omitted.) *People v. McKown*, 226 Ill. 2d 245, 254 (2007) (quoting *In re Commitment of Simons*, 213 Ill. 2d 523, 529-30 (2004)). "*Frye* applies only to scientific evidence," which the supreme court has defined as evidence that is "the product of scientific tests or studies." *Id.*

¶ 46        Defendant contends that HCSA "should be subject to a *Frye* inquiry because it is, in theory, based on science." Agent Raschke explained that HCSA consists of analyzing call log records compiled by cell phone providers that memorialize information about phone calls, including the call's date and time, as well as the specific cell towers the phone utilized during the call. Using this information, Agent Raschke prepared a map showing which cell towers defendant's and Kelli's phones utilized throughout October 27 and 28, 2011. This does not qualify as scientific evidence. See *People v. Fountain*, 2016 IL App (1st) 131474, ¶ 58 ("Reading the coordinates of cell sites from phone records and plotting them on a map is not a scientific procedure or technique ***."); accord *People v. Williams*, 2017 IL App (1st) 142733, ¶¶ 39-40.

¶ 47        Because the *Frye* standard does not apply to Agent Raschke's HCSA testimony, the circuit court would have rejected a request by the defense to hold a *Frye* hearing. Because such a request would have been futile, defendant's ineffective assistance of counsel claim fails.

¶ 48        Finally, we consider defendant's argument that trial counsel was ineffective because he did not object to the jury receiving a single general verdict form despite the fact that the State proceeded on three theories (intentional, knowing, and felony) of first degree murder. This argument is predicated on *People v. Smith*, 233 Ill. 2d 1 (2009).

¶ 49        In *Smith*, the defendant was charged with first degree murder under intentional, knowing, and felony theories. The defendant requested specific verdict forms, but the circuit court declined and instead tendered a single general first degree murder verdict form to the jury. The supreme court found that was error, holding that, "where *** specific findings by the jury with regard to the offenses charged could result in different sentencing consequences, favorable to the defendant, specific verdict forms must be provided upon request and the failure to provide them is an abuse of discretion." *Id.* at 23.

¶ 50        Since it was decided, this court has repeatedly refused to apply *Smith* to cases that did not involve the circuit court's refusal of a defense request for separate verdict forms. For example, in *People v. Braboy*, 393 Ill. App. 3d 100 (2009), this court held that *Smith* could not support a claim of ineffective assistance of counsel, reasoning that *Smith* is "limited to situations in which the trial court actually denied a request for separate verdict forms." *Id.* at 108; see also *People v. Mabry*, 398 Ill. App. 3d 745, 756 (2010) (same); *People v. Calhoun*, 404 Ill. App. 3d 362, 383-84 (2010) (same). Defendant offers no compelling reason for us to decline to follow *Braboy*, *Mabry*, and *Calhoun*. Accordingly, we, too, hold that *Smith* is "limited to situations in which the trial court actually denied a request for separate verdict forms" (*Braboy*, 393 Ill. App. 3d at 108) and does not support a claim of ineffective assistance of counsel.

¶ 51        Moreover, even if *Smith* could support a claim of ineffective assistance of counsel, defendant's argument would still fail because, under the facts of the case, counsel's decision not to request specific verdict forms was likely a strategic decision immune from an ineffective assistance of counsel claim. At trial, defendant's theory of the case was that the State, as

defendant puts it, "had the wrong man." As this court explained in *People v. Hill*, 2014 IL App (2d) 120506, ¶ 71, "since defendant's theory at trial appeared to be that he did not commit the offense, and not that he committed certain acts but did not commit intentional or knowing murder, the decision not to separate felony murder from the other offenses was presumably a tactical decision." For this additional reason, defendant's ineffective assistance of counsel claim fails.

¶ 52                                    CONCLUSION

¶ 53        We reject defendant's contentions of error and affirm his conviction.

¶ 54        Affirmed.