2020 IL App (1st) 172248-U

No. 1-17-2248

Order filed June 26, 2020

Fifth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 13 CR 3180 |
| | ) | |
| BRIAN JONES, | ) | Honorable |
| | ) | Allen F. Murphy, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE DELORT delivered the judgment of the court.
Presiding Justice Hoffman and Justice Rochford concurred in the judgment.

**ORDER**

¶ 1    *Held*:    We affirm defendant's conviction for robbery and residential burglary over his contention that the admission into evidence of codefendants' prior inconsistent statements violated his constitutional right to confront the witnesses against him.

¶ 2                                    BACKGROUND

¶ 3    Defendant, Brian Jones, was charged with one count of home invasion (720 ILCS 5/12-11 (West 2012)), one count of armed robbery (720 ILCS 5/18-2 (West 2012)), two counts of aggravated kidnapping (720 ILCS 5/10-2 (West 2012)), one count of residential burglary (720

ILCS 5/19-3 (West 2012)), and one count of unlawful restraint (720 ILCS 5/10-3.1 (West 2012)). Justin Bonds, Jordon Cummings, Shaquille Whisenton, and Darrell Wright were codefendants in this case, but are not parties to this appeal.

¶ 4     The first witness at defendant's bench trial was Shaquille Whisenton. By the time of defendant's trial, Whisenton had already pleaded guilty to residential burglary and was on supervised release. When called to testify, Whisenton attempted to invoke his fifth amendment privilege against self-incrimination. Because Whisenton had already pleaded guilty and served the custodial portion of his sentence, the court ruled that he no longer had any fifth amendment privilege.

¶ 5     Whisenton testified that on January 10, 2013, Jasmine Bonds invited him to her mother's house in Lansing, Illinois.[1] He testified that he went to the house and that Justin arrived at the house at some point. Whisenton also testified that the next day, he was with "[t]he people that's on this case," including defendant, whom he identified in the court room. The bulk of his testimony, however, was that he had no memory of those two days, including no recollection of what he did or what he told the police. He acknowledged his signature on a written statement made on January 15, 2013. He also acknowledged his signature on several photographs, including one of defendant. But he maintained that he remembered neither making the statement nor the underlying events. He attributed his lack of memory to the fact that he was on medications, "smoked PCP that day," and "was super high." Over defense counsel's foundational objection that Whisenton had not been questioned about portions of the statement,

---

[1] Because Jasmine Bonds, Justin Bonds, and their mother Okima Bonds have the same last name, we will refer to them by their first names.

the circuit court admitted Whisenton's written statement into evidence pursuant to 725 ILCS 5/115-10.1 (West 2016).

¶ 6     In his statement, Whisenton described how on January 10, 2013, he visited Jasmine at Okima's house. There, he ran into Justin, and he, Justin, and Jasmine walked to the store for snacks. That evening, Whisenton, Cummings, and Justin discussed taking televisions, laptops, and a video game system from Okima's house. The next morning, at Whisenton's house, the three men again discussed their plan. Whisenton was to visit Jasmine and keep her in the bedroom as the others, including defendant, came into the house and stole Okima's things. After Whisenton called Jasmine and secured an invitation, Cummings drove him, Justin, Wright, and defendant to Okima's house in defendant's mother's Chevrolet Malibu. Whisenton went into the house while the others waited in the car. Eventually, defendant, Justin, Wright, and Cummings all came into the house through the back door. Wright told Jasmine to get into the bathroom. At one point, defendant told Whisenton to stand by the bathroom door to prevent Jasmine from getting out. Whisenton watched as Justin, Wright, Cummings, and defendant took items— including two laptops, four televisions, a jug of coins, and jewelry—and placed them in the trunk of the Malibu.

¶ 7     With Cummings driving, the group left the house and headed to Chicago. Whisenton called Leopoldo Alejandre,[2] hoping to sell the stolen items to him. Before they could meet with Alejandre, they were taken into custody by the Chicago Police Department. Whisenton, Justin, Wright, and defendant were released after about ten hours. After their release, they went back to the car and drove to a grocery store to exchange the jug of coins for cash. They then drove to

_____

[2] Throughout Whisenton's and Cummings's statements, Alejandre is referred to by his nickname "Polo."

Alejandre's house and parked in his garage. Alejandre gave them $840 for the televisions and laptops.

¶ 8      Counsel for defendant cross-examined Whisenton about the conditions under which he was held by the police and made his written statement. Counsel also asked Whisenton about his drug use and his medication for ADHD and bipolar disorder, and about how the drugs affect his memory.

¶ 9      The next witness was Jordon Cummings. Like Whisenton, Cummings had already pleaded guilty to residential burglary and served the custodial portion of his sentence. He testified that on January 11, 2013, he lived with Whisenton and Whisenton's mother. Early that morning, Justin and defendant—whom Cummings identified in court—came over to Whisenton's house. Cummings identified a photo of the car that defendant drove that morning. Cummings testified that he drove the group, with defendant in the front passenger seat, to pick up Wright. From there, he drove the car to Okima's house and pulled into the driveway. He also testified to, sometime later, driving away from Okima's house and driving to Chicago. The rest of Cummings's testimony consisted of him claiming not to remember the events of that day. However, he did acknowledge giving a written statement to the police and signing several photographs. Over defense counsel's foundational objection that Cummings had not been questioned about portions of the statement, the circuit court admitted the written statement into evidence pursuant to 725 ILCS 5/115-10.1 (West 2016).

¶ 10     In Cummings's written statement, he described how he, Whisenton, Wright, Justin, and defendant, planned to go to Okima's house to take laptops and televisions to sell. On the morning of January 11th, Cummings and the others drove to Okima's house. Whisenton got out of the car

and went into the house. The plan was for Whisenton to distract Jasmine while the others entered the house and took the items. After Whisenton signaled to somebody in the car, Cummings drove the car into the driveway of the house. Jasmine came out of the back door and asked what they were doing there. Cummings put on a mask and went into the house with the others. When they got inside, one of the other men put Jasmine into the bathroom. After Jasmine was in the bathroom, defendant, Wright, and Justin started loading up the car with laptops and televisions. Cummings stated that he did not help load the trunk, but that when the items were loaded into the car, he drove the car to Chicago with defendant, Whisenton, Justin, and Wright.

¶ 11    On their way to Chicago, Whisenton made a phone call to a potential buyer for the stolen items. When they arrived in Chicago, the buyer was not ready to meet with them, so they drove to a grocery store so that they could exchange a jug of coins that they had taken from the house. Before they could sell the property, the men were stopped by the police. The police arrested Cummings because he had an outstanding warrant against him. Near the end of the typewritten statement was a handwritten addition, initialed by Cummings, indicating that he was "sorry for the part he played."

¶ 12    Leopoldo Alejandre then testified that on the evening of January 11, 2013, Whisenton pulled into his garage in a Chevrolet Malibu. He also identified defendant—whom he had seen with Whisenton before—as an occupant of the car. Two of the men with Whisenton and defendant then offered to sell Alejandre some jewelry and electronics that they had in the trunk of the car. Alejandre paid them cash for some of the electronics but declined to purchase the jewelry. Sometime later, the police contacted Alejandre about the electronics and he turned them

over to the police. Alejandre also identified signed photographs of defendant, the Chevrolet Malibu, and the stolen electronics and jewelry.

¶ 13    The next witness was detective Michael Rodriguez of the Lansing Police Department. He testified that, pursuant to a warrant, he searched a Chevrolet Malibu for stolen goods. In the trunk of the car, he "found a VCR, a purse and a net book case." Sometime later, he called Okima to identify the items found in the car.

¶ 14    Okima Bonds testified that in January of 2013, she lived with Jasmine, Justin, and another son. At some point, she kicked Justin out of the family home for "being very disrespectful, and *** taking things from the property that didn't belong to him." On January 10, 2013, Okima visited a friend and planned to spend the night. Early in the morning of January 11, Jasmine called Okima and asked "when she was coming home, what was she doing, and things of that nature, which [Okima] found very weird." Less than an hour later, Jasmine called again to tell Okima that there had been a robbery. When Okima returned home, she found that the house had been "ransacked." Missing from the home were "[t]hree or four flat screen TVs, laptop, two netbooks, several cell phones, jewelry, video games, VCR, clothing, shoes, things of that nature." Okima identified photos of the recovered electronics, jewelry, VCR, and purse.

¶ 15    Jasmine Bonds then testified that she lived with her mother and brothers in January, 2013. She testified that at some point, Okima kicked Justin out of the house. As of January 10, 2013, Jasmine was dating Whisenton. That day, she invited Whisenton to the house. Shortly after he arrived, Justin also arrived. The three of them walked to the store, where Whisenton and Justin talked to some men that Jasmine did not know. They then returned to the house and Whisenton and Justin left together.

¶ 16    The next morning, Whisenton called her and she invited him over again. Whisenton arrived alone, and Jasmine invited him in. Shortly thereafter, she heard a knock at the back door. She opened the door to find Justin. Behind Justin, in the driveway, was a car that Jasmine did not recognize. Out of the car came four men, "two with hoods, two put on face masks." Jasmine testified that her brother fled, and the men from the car forced their way into the house. The first man, who was wearing a mask, put a gun to the back of her head and told her to go into the bathroom. While locked in the bathroom, she cried and prayed loudly until she realized that she had her younger brother's phone in her pocket. Before she could unlock the phone and call for help, a man—whom she identified in court as defendant—came into the bathroom and took it out of her hands. After she resumed crying and praying loudly, somebody from the other side of the bathroom door told her to "shut the f*** up or they would blow [her] brains out."

¶ 17    When the house became quiet, Jasmine left the bathroom. Whisenton was still in the house, and he told Jasmine "to go back into the bathroom because he didn't believe the coast was clear." Jasmine testified that she returned to the bathroom for several minutes, and when she came out again, the house was empty. She then called her mother, who told her to call the police. Some days later, Jasmine identified defendant in a lineup at the police station. She also identified photos of electronics that had been stolen from the house. She testified that although defendant had put his hood up as he approached the house, when he took the phone from her, his hood was down, and she had a well-lit, unobstructed view of his face.

¶ 18    On cross-examination, Jasmine admitted that she had depression and bipolar disorder. She also admitted that she never saw a gun, she only felt something against her head. Defendant's counsel confronted Jasmine with inconsistencies in the report of her first

conversation with the police. On redirect-examination, Jasmine explained that she did not want her mother to know about her relationship with Whisenton, which is why he was not mentioned in her initial report to the police.

¶ 19    Assistant State's Attorney Andres Alemendarez and detective Chuck Weeden of the Lansing Police Department testified about the custodial interviews of Cummings and Whisenton, respectively. They each testified how the written statements were obtained, how Cummings and Whisenton each suggested and initialed changes to their respective statements, and how Cummings and Whisenton signed each page. Weeden testified that Whisenton did not appear to be under the influence of any drugs and that Whisenton stated that he had not consumed any drugs or alcohol since January 12, 2013.

¶ 20    In support of defendant's motion for a directed verdict, defense counsel argued in part that "the testimony really consists at this point of un-confronted evidence from a couple of individuals who the state presented their statements, I guess statements against penal interest, so we really couldn't cross-examine them in details." The circuit court denied the motion.

¶ 21    Defendant then recalled Michael Rodriguez of the Lansing Police Department. Rodriguez testified that Jasmine "did give me different details when I interviewed her several times." Among the different details were a physical description of the person who took the phone from her that apparently did not match defendant and the fact that she saw a gun. On cross-examination, Rodriguez testified that Jasmine positively identified defendant in a lineup as the person who took the phone from her. Officer Klausner[3], also of the Lansing Police Department, testified that Jasmine initially reported that, as she was opening the door for her brother, a man in

---

[3] Officer Klausner's first name does not appear in the record.

a grey hooded sweatshirt and black winter facemask kicked the door open. He also testified that Jasmine told him that the man put a small silver handgun in her face.

¶ 22    After the defense rested, the circuit court convicted defendant of residential burglary, aggravated kidnapping, robbery, kidnapping, and unlawful restraint. Defendant moved for a new trial, which motion the court denied. The court sentenced defendant to six years' imprisonment on the count of aggravated kidnapping, noting that the unlawful restraint and simple kidnapping counts would merge into the aggravated kidnapping count. The court also sentenced defendant to three years' imprisonment on the count of robbery, and four years' imprisonment on the count of residential burglary, to be served concurrently.

¶ 23    Defendant filed a second posttrial motion, which the court granted in part. The court entered a finding of not guilty on the counts of kidnapping and aggravated kidnapping because the kidnapping was "incidental to the residential burglary and robbery." The court resentenced defendant to four years' imprisonment on the count of residential burglary, and three years on the count of robbery, to be served concurrently, with two years of mandatory supervised release. This appeal follows.

¶ 24                                ANALYSIS

¶ 25    On appeal, defendant argues that the court violated his constitutional right to confront the witnesses against him by admitting the written statements of Whisenton and Cummings pursuant to 725 ILCS 5/115-10.1 (West 2016). Relying on *People v. Learn*, 396 Ill. App. 3d 891 (2009), he argues that Whisenton and Cummings's alleged memory loss made meaningful cross-examination impossible, rendering them "unavailable" for cross-examination.

¶ 26    As a preliminary matter, the State argues that defendant forfeited review of this claim by failing to specifically object to the availability of Whisenton and Cummings at trial and by failing to specifically raise the issue in his posttrial motions. See *People v. Mohr*, 228 Ill. 2d 53, 64-65 (2008). Defendant argues that his objections were properly made and preserved. Moreover, to the extent that defendant has forfeited review of this issue, he contends that this court may review the issue for plain error. See *People v. Herron*, 215 Ill. 2d 167, 178-79 (2005). "The plain-error doctrine allows a reviewing court to address defects affecting substantial rights if the evidence is closely balanced or if fundamental fairness requires." *People v. Echavarria*, 362 Ill. App. 3d 599, 607 (2005). The first step in the plain-error analysis is to determine whether error occurred because, if there is no error, there can be no plain error. *People v. Wilson*, 2017 IL App (1st) 143183.

¶ 27    The relevant portions of section 115-10.1 allow out-of-court statements to be admitted as substantive evidence in a criminal trial if (1) the statement is inconsistent with the witness's testimony at trial, (2) the witness is subject to cross-examination about the statement, (3) the statement "narrates, describes, or explains an event or condition of which the witness had personal knowledge," and (4) the statement is signed by the witness. 725 ILCS 5/115-10.1 (West 2016).

¶ 28    Defendant does not dispute that the statements of Whisenton and Cummings met the requirements of section 115-10.1. However, to be admissible, a witness's prior inconsistent statement must satisfy both section 115-10.1 and the confrontation clause. *People v. Tracewski*, 399 Ill. App. 3d 1160, 1165 (2010); *People v. Martin*, 408 Ill. App. 3d 891, 896 (2011). The

confrontation clause requires that "[i]n all criminal prosecutions, the accused shall enjoy the right *** to be confronted with the witnesses against him." U.S. Const., amend. VI.

¶ 29    Under the confrontation clause, a testimonial out-of-court statement is admissible only if (1) the witness is available for cross-examination at trial; or (2) the witness is unavailable at trial, and the defendant had an earlier opportunity to cross-examine him. *Crawford v. Washington*, 541 U.S. 36, 68 (2004). "Ordinarily a witness is regarded as 'subject to cross-examination' when he is placed on the stand, under oath, and responds willingly to questions." *United States v. Owens*, 484 U.S. 554, 561 (1988).

¶ 30    The right to cross-examine witnesses is not guaranteed "in whatever way, and to whatever extent, the defense might wish." *People v. Hampton*, 387 Ill. App. 3d 206, 214 (2008). Consequently, "a gap in the witness'[s] recollection concerning the content of a prior statement does not necessarily preclude an opportunity for effective cross-examination." *People v. Flores*, 128 Ill. 2d 66, 88 (1989). "The confrontation clause is not violated when a witness appears, answers questions, and is cross-examined, but is unable to remember previous events." *Martin*, 408 Ill. App. 3d at 896. "There are no confrontation[-]clause problems merely because the witness's memory problems preclude him from being cross-examined to the extent the parties would have liked." *Tracewski*, 399 Ill. App. 3d at 1166 (quoting *People v. Leonard*, 391 Ill. App. 3d 926, 934-35 (2009)).

¶ 31    Here, Whisenton and Cummings physically appeared at trial, were placed under oath, and answered substantive questions. Contrary to defendant's assertion, their testimony supported the State's theory of the case. Both witnesses admitted to being with defendant on January 11, 2013. Cummings identified a photograph of the car that defendant drove to Whisenton's house that

morning. He also testified that he drove that same car, with defendant in the front passenger seat, into Okima's driveway. He also admitted to driving that same car away from the house, again with defendant and the others, to Chicago. Although the testimony is not direct evidence of a crime, it is certainly incriminating. The testimony places defendant at the scene of the crime and in the presence of other people alleged to have been at the scene. The testimony also places defendant in the car from which stolen property was recovered by Rodriguez. It corroborates the other evidence in the case, including Jasmine's description of the burglary and identification of defendant at the crime scene as well as Alejandre's identification of defendant in Chicago that evening, in possession of the stolen property.

¶ 32    Defense counsel elected not to cross-examine Cummings at all, even on the substantive testimony that he gave. Defense counsel did cross-examine Whisenton about the conditions under which he made his statement, and he answered defense counsel's questions. In sum, the witnesses were able to answer questions and willingly did so. Defendant may have wished to cross-examine them to a greater extent, but their alleged lack of memory did not render them "unavailable" for cross-examination.

¶ 33    Defendant relies on an inapposite string of cases including *In re Rolandis G.*, 232 Ill. 2d 13 (2008), *People v. Learn*, 396 Ill. App. 3d 891 (2009), and *In re Brandon P.*, 2014 IL116653. In each of those cases, the witness deemed unavailable for cross-examination was a child who had allegedly been abused. See *In re Rolandis G.*, 232 Ill. 2d at 8 (six-year-old witness "resolutely refused to respond" and "could not bring himself to answer questions about the allegations"); *Learn*, 396 Ill. App. 3d at 897, 900 (five-year-old witness broke down crying in response to most questions and "did not testify at all about the charge in this case and barely

acknowledged the people and places about which she was questioned."); *In re Brandon P.*, 2014 IL116653, ¶16 (four-year-old witness "could barely answer the trial court's preliminary questions, and then completely froze when the State attempted to begin its direct examination of her."). The child witnesses in those cases did not merely assert that they could not remember certain events; they were practically unable to answer any questions whatsoever. Whisenton and Cummings, on the other hand, were not children and answered every question put to them, albeit often by asserting memory loss. As discussed above, however, several of the answers they provided were substantive and tended to prove the State's case. In short, Whisenton and Cummings's professed memory lapses were wholly unlike the utter inability of the child witnesses to testify because they "resolutely refused to respond", "froze up", or broke down crying.

¶ 34    This case is much more in line with *Tracewski*. In *Tracewski*, the witness "acknowledged writing and signing the statement" but claimed not to remember the relevant events "because she had been drinking for a month straight." *Tracewski*, 399 Ill. App. 3d at 1164. On cross-examination, the witness claimed not to recall writing the statement. *Id.* Notwithstanding the witness's professed memory loss, the *Tracewski* court held that the defendant's right to confront the witness was not violated because the witness "physically appeared at trial and was subject to cross-examination by defense counsel." *Id.* at 1166. Defense counsel had the opportunity to cross-examine Whisenton and Cummings as to their memories and the conditions under which they made their statements to the police. The circuit court, as the finder of fact, was able to observe their demeanors and judge their credibility as witnesses. Accordingly, the admission of their written statements did not violate defendant's right to confrontation.

¶ 35    In *Crawford*, the Court stated that the confrontation "[c]lause does not bar admission of a statement so long as the declarant is present at trial to defend or explain it." *Crawford*, 541 U.S. at 59 n9. Whisenton and Cummings were certainly present at trial and explained their statements by professing not to remember anything. The fact that defense counsel did not find such explanations to be satisfactory is of no moment. Accordingly, there was no error, and we need not address the State's argument that the defendant forfeited this issue, nor whether the admission of the evidence amounted to plain error. We affirm the judgment of the circuit court.

¶ 36    Affirmed.