2020 IL App (2d) 170299-U
No. 2-17-0299
Order filed April 30, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Winnebago County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 12-CF-3379 |
| TODD CHRISTOPHER SMITH, | ) ) ) | Honorable Fernando L. Engelsma, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE McLAREN delivered the judgment of the court.
Justices Hutchinson and Bridges concurred in the judgment.

**ORDER**

¶ 1    Held:  (1) The trial court did not err in admitting evidence of other acts, as it could be used as evidence of motive; (2) defendant forfeited contention that trial court improperly allowed expert testimony regarding GPS by failing to object at trial and to include issue in his motion for a new trial; (3) testimony regarding defendant's cell phone vis-à-vis cell towers and the locations of evidence recovered in the case was not expert testimony and was not admitted improperly.  Trial court affirmed.

¶ 2    After a jury trial, defendant, Todd Christopher Smith, was found guilty of first degree murder (720 ILCS 5/9-I(a)(I) (West 2012)) and concealment of a homicidal death (730 ILCS 5/3-6-3 (West 2012)) and was sentenced to consecutive terms of 55 and 4 years in the Department of Corrections.  All charges arose from the October 22, 2012 death of defendant's estranged wife,

Katrina Smith. Defendant now appeals from those convictions, raising four issues: (1) whether the trial court erred in admitting other-crimes evidence; (2) whether the trial court erred in allowing testimony about GPS coordinates found on defendant's computer; (3) whether the trial court improperly allowed a lay witness to present expert testimony; and (4) whether the cumulative effects of these alleged errors deprived him of due process and a fair trial. We affirm.

¶ 3                                I. BACKGROUND

¶ 4      The body of Katrina Smith was found in the Rock River near Byron, Illinois on November 9, 2012. The cause of Katrina's death was determined to be blunt force trauma to the head. Defendant had reported Katrina missing on October 23, 2012. Katrina and defendant had been married since 2005, but Katrina had moved out of their house in mid-October.

¶ 5      The day after he reported Katrina missing, defendant told police that Katrina was staying with a friend in a condo Roscoe, Illinois. She returned to the house after work on Monday, October 22 to do laundry. She told defendant that she had a job interview the next day and left to go shopping. After she returned, she left again at about 9:00 p.m.; although she said that she would return, she did not do so. Defendant texted her at about 10:30 p.m. and again at 6:30 the following morning to wish her luck on her interview. She did not respond to either text or to two calls from defendant after her scheduled interview. After Katrina's boss called to say that she did not show up to work, defendant went to the Roscoe condo, then called police.

¶ 6      Jennifer Lee, a dispatcher for the Illinois State Police, would later testify that she saw Katrina's car stopped on the Latham Street Bridge in Machesney Park at about 11:20 p.m. on October 22. Lee had to drive slowly past the car, as it partially blocked her lane, and there was traffic on the bridge travelling in the other direction. The trunk was open and lit, and the taillights were on. She saw a young woman with light-to-medium brown, straight, shoulder-length hair,

wearing a backpack, squatting behind the car, facing the side of the bridge. She saw no one else with the woman or in her car, and she saw no blood. The woman appeared to be conscious and had not motioned for help. Lee called 911 to report what she had seen and to request a well-being check, as she thought that the woman might have been ill or about to vomit. Lee gathered as much information as she could to give to the 911 dispatcher, knowing, as a dispatcher herself, the importance of accurate information.

¶ 7　　Katrina's car was found in Machesney Park on October 23, parked near the intersection of Ventura Boulevard and Obispo Avenue. Several witnesses would later testify that they saw a car matching Katrina's car near that intersection at around 11:00 p.m. on October 22. On October 26, a large clump of bloody paper towels was found near that intersection. DNA testing revealed a partial female DNA profile, and Katrina could not be excluded as a possible source of the DNA.

¶ 8　　The car was unoccupied and locked when it was found, with a jacket, shopping bags, and a backpack in the back seat. A bloodstained towel was found in the trunk; two of the stains contained blood that matched Katrina's DNA profile. Forensic testing of the trunk floor liner also revealed bloodstains that were found to match Katrina's DNA.

¶ 9　　The State obtained two surveillance videos from private security systems. The first, from the home of Edward Blecker at 9613 Norman Avenue in Machesney Park, showed a person walking on Norman Avenue and then cutting through the corner of his yard at 11:31:29 p.m. on October 22. Blecker later testified that the intersection of Ventura and Obispo was approximately a mile northwest of his house. He could not tell the age or gender of the person and could not say if the person was carrying a backpack or duffel bag.

¶ 10　　The second video was from 8416 Elm Avenue in Machesney Park, the home of Adam Peterson. Peterson would later testify that the video showed a person walking south on Elm and

then east on Ashdown at about 12:21 a.m. on October 23. Peterson could not tell the age or gender of the person or whether the person was carrying anything or possessed a backpack. He described the area as "fairly populated," with teenagers living in the area.

¶ 11    A search of defendant's garage on October 24 revealed a pair of black, ankle-high boots that were wet and covered with dirt, weeds and debris. The boots looked as if they had been "worn in a very wet area and in an area that was more rugged than just a normal grass yard, like a field or somewhere like that that had longer pieces of weed and straw and debris." A subsequent search of the garage also disclosed an aluminum baseball bat that appeared to have three spots of blood on it. Preliminary testing on two of the spots were positive for the probable presence of human blood, and DNA analysis of one of the spots revealed a profile that matched Katrina's. According to testimony at trial, the DNA on the bat could have come from sweat or skin cells, otherwise known as "touch DNA." The end of the barrel of the bat had "some apparent cobwebs or some type of fibrous material" stuck to it.

¶ 12    Katrina's cell phone was found under a bush in front of 723 Ralston Road in Machesney Park on October 25. The following day, her wallet was found on the road near the intersection of South Lane and Main Streets in Rockford. The wallet contained shopping receipts from 7:11p.m. and 8:00 p.m. on October 22.

¶ 13    Evidence found on defendant's computer regarding GPS tracking and an incident that occurred at Katrina's office shortly before her murder, along with evidence involving cell phone records and cell tower locations, will be discussed in detail in the analysis of defendant's contentions on appeal, *infra*.

¶ 14    The State eventually brought a 22-count superceding bill of indictment, charging defendant with 18 counts of first-degree murder under various theories and single counts of aggravated

domestic battery, concealment of homicidal death, aggravated battery, and aggravated unlawful restraint. At the end of the State's case at trial, the trial court directed verdicts in defendant's favor on 12 of the murder charges and the charge of aggravated unlawful restraint. Defendant was eventually found guilty on all remaining charges and sentenced to the Department of Corrections. This appeal followed.

¶ 15                                    II. ANALYSIS

¶ 16    Defendant first contends that the trial court erred in admitting other-crimes evidence. Evidence of other crimes is admissible if it is relevant for any purpose other than to show the defendant's propensity to commit crimes. *People v. Wilson*, 214 Ill. 2d 127,135 (2005). Supreme Court Rule 404(b) provides:

> "Evidence of other crimes, wrongs, or acts is not admissible to prove the character
> of a person in order to show action in conformity therewith except as provided by sections
> 115–7.3, 115–7.4, and 115–20 of the Code of Criminal Procedure (725 ILCS 5/115–7.3,
> 725 ILCS 5/115–7.4, and 725 ILCS 5/115–20). Such evidence may also be admissible for
> other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge,
> identity, or absence of mistake or accident." SCR 404(b) (eff. Jan. 1, 2011).

Other-crimes evidence may also be permissibly used to show, by similar acts or incidents, that the act in question was not performed inadvertently, accidently, involuntarily, or without guilty knowledge. *Wilson*, 214 Ill. 2d at 136. Even if relevant to a purpose other than showing the mere propensity to commit crime, evidence of other crimes may be excluded if its probative value is outweighed by its prejudicial effect. *People v. Adkins*, 239 Ill. 2d 1, 23 (2010). Where such evidence is offered, it is admissible so long as it bears some threshold similarity to the crime charged. *Wilson*, 214 Ill. 2d at 136. The admissibility of other-crimes evidence rests within the

sound discretion of the trial court, and its decision on the matter will not be disturbed absent a clear abuse of discretion. *Adkins*, 239 Ill. 2d at 23. A court's decision is against the manifest weight of the evidence only where it is arbitrary or fanciful or no reasonable person would adopt the trial court's view. *People v. Becker*, 239 Ill. 2d 215, 234 (2010). The erroneous admission of other-crimes evidence calls for reversal only where the evidence was "a material factor in the defendant's conviction such that, without the evidence, the verdict likely would have been different." *Adkins*, 239 Ill. 2d at 23, quoting *People v. Hall*, 194 Ill. 2d 305, 339 (2000).

¶ 17    Defendant argues that the trial court erred in granting the State's motion *in limine* to admit testimony regarding an incident that occurred at about 10:40 a.m. on October 9, 2012 in which an unidentified person threw hundreds of fliers out of the sunroof of a black car as it drove through the parking lot at Camryn Industries, where Katrina was employed. The flier was headlined "Guy F***s Cat" and alleged a sexual relationship between a Catrina from the human resources department (where Katrina Smith worked) and Guy Gabriel, a co-worker. No one identified defendant as the person throwing the fliers. Defendant, who denied having anything to do with the incident, presented testimony from an attorney that defendant was present with him at a status hearing at the Stephenson County circuit court possibly as late as 10:00 or 11:00 a.m. on that date approximately an hour away from Katrina's office.

¶ 18    A forensic examination of defendant's laptop computer revealed the phrase "Guy f***s Cat" and other phrases from the flier in "hiberfil system" of the computer, where the computer saves content that is on the screen when the computer goes into the hibernation mode. Detective Juanez, who performed the examination, could not say when the phrases from the flier were saved in the hiberfil system, and he did not recover an original document or a file containing the complete flier. He also acknowledged that the hiberfil system was modified on October 30, 2012, which

was the date that the police seized the computer but not the day on which the examination was performed.

¶ 19 The trial court found that there was no evidence that defendant distributed the fliers but that the existence of the words "Guy f***s Kat" was found on his computer with his user name was circumstantial evidence that he created the flier. Further, even if defendant did not generate the flier, the existence of the phrase on his computer created a reasonable inference that he knew of an allegation of an affair between his wife and a co-worker, and the knowledge of an affair could be argued as motive.

¶ 20 Defendant argues that, while the flier incident occurred on October 9, defendant's computer was not collected as evidence until October 30, and defendant and Katrina's family were shown copies of the flier on October 26. According to defendant, it was possible that defendant or someone using his computer wrote the phrase in an e-mail or in an internet search; without evidence to show that the computer recorded that phrase in the hiberfil prior to defendant being shown the flier, there was nothing more than mere suspicion that defendant participated in the flier incident.

¶ 21 However, the admissibility of the evidence does not depend on only defendant's possible participation in the flier incident. Again, Rule 404(b) allows evidence of other "acts," not just other crimes, and such evidence is admissible for various purposes, including "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." SCR 404(b) (eff. Jan. 1, 2011). The standard for the admissibility of such evidence is more than mere suspicion but less than beyond a reasonable doubt. *People v. Gregory*, 2016 IL App (2d) 140294, ¶ 23.

¶ 22   As the trial court found, the existence of language from the flier on defendant's computer was evidence that defendant was aware of allegations that his estranged wife was involved in a sexual relationship with another man, thus potentially showing a motive to murder her. Further, this evidence was not made inadmissible by the fact that someone else could have theoretically placed the information on his computer. The information was found on his laptop computer that was accessed with his user name. While this does not rise to a level of beyond a reasonable doubt, it is certainly more than mere suspicion.

¶ 23   Finally, even if the admission of this evidence were in error, the erroneous admission of other-crimes evidence will be reversed only where the evidence was "a material factor in the defendant's conviction such that, without the evidence, the verdict likely would have been different." *Adkins*, 239 Ill. 2d at 23. Evidence of the flier evidence was not so material as to change the verdict, especially in light of all the other evidence. We can find no abuse of discretion, and no error, here.

¶ 24   Defendant next contends that the trial court erred in allowing opinion testimony regarding the source and meaning of GPS coordinates found on defendant's computer. According to defendant, the State failed to provide a foundation for the expert opinion of Investigator Juanez, who testified that a series of "pings," possibly from a GPS tracker, that were found on defendant's computer, were consistent with a map of locations where police found various pieces of evidence, including Katrina's car, bloody paper towels, and Katrina's cell phone, and the home surveillance videos from the night of the murder.

¶ 25   In general, a witness will be permitted to testify as an expert if his experience and qualifications afford him knowledge that is not common to lay persons and where such testimony will aid the trier of fact in reaching its conclusion. *People v. King*, 2020 IL 123926, ¶ 35. A trial

court should balance the probative value of the evidence against its prejudicial effect to determine the reliability of the testimony. *Id*. Further, in the exercise of its discretion, a trial court should carefully consider the necessity and relevance of the proposed expert testimony in light of the particular facts of the case before admitting the testimony for the jury's consideration. *Id*. Expert testimony is necessary only when the subject is both particularly within the witness' experience and qualifications and beyond that of the average juror's, and when it will aid the jury in reaching its conclusion. *Id*. When determining the reliability of an expert witness, a trial court is given broad discretion, and we review the trial court's decision to admit such evidence for an abuse of that discretion. *Id*.

¶ 26    Juanez was qualified by the trial court as an expert in computer and cell phone forensics. Juanez testified that, in performing a forensic analysis of defendant's laptop computer, he found evidence that Super Trackstick software had been installed on the computer in 2011and that files from September 11, 2011 and October 4, 2012 had been saved to the computer. The Trackstick program had been uninstalled before Juanez's analysis. After further analysis, he discovered GPS coordinates, labeled with the date of October 22, 2012 and time stamps, stored in the Internet Explorer cache. He did not know how or when that information got onto the computer or what it meant. He did not know if it came from the Trackstick tracking device, as the device was never found.

¶ 27    Juanez testified:

> "Trackstick is a GPS device, and the way it works it's—it comes in a small—it's a small device that has a USB port on it. That will—that actually works with a satellite. So—and it's activated by movement.

So as that device is moving, it's capturing the satellite location, which would be GPS coordinates or any coordinates like that. And it's going to log it onto that device. Once that is logged, the user has to take that device and plug it into a computer that is using the Super Trackstick software.

Once it's plugged into it, then it's going to go ahead and it's going to grab everything—all the GPS coordinates that [the] device captured from the satellite, it's going to grab those and put them into your computer in a specific folder. That software, which is the Super Trackstick that was installed on this one, will then— will then access the Internet; and it will reach out to Google.

And it's going to put it into any—Google uses Google Maps and Google Earth, and it's going to dump all those coordinates into Google Earth and Google Maps, and then it's going to bring out a nice picture showing of where all those coordinates were pinging at at [*sic*] the time that it was pinging or that it was being used or that it was moving."

¶ 28 Juanez created a spreadsheet of the coordinates and times and then, using Google Maps, plotted the October 22, 2012 coordinates on a map that was admitted as evidence. He also created Google Maps printouts showing locations of various pieces of recovered evidence in the case, then testified that the "path" of the GPS coordinates "was consistent with the location of all the areas of evidence that were recovered during this investigation," including Karina's car, bloody paper towels, and Katrina's cellphone, and led to the general area of defendant's home.

¶ 29 Defendant argues that this testimony went beyond Juanez's expertise as an expert in computer and cell phone forensics to an area outside of that expertise—as an expert in GPS trackers or the interpretation of GPS data. We disagree. We first note that defendant did not object when

Juanez gave his description of how GPS works, nor did he include this issue in his amended motion for a new trial. To preserve an issue for appeal, a defendant must both object at trial and raise the issue in his posttrial motion; failure to do so results in forfeiture. *People v. Wilson*, 2017 IL App (1st) 143183, ¶ 22. Further, Juanez's explanation of the working of the Trackstick device, and GPS in general, was not of such a complex or technical nature that it required certification as an expert in GPS technology. Juanez's description of how GPS worked was rudimentary, stating that a GPS device is activated by movement, works with satellites, and records the satellite location. More of his GPS testimony involved the working of the computer receiving the downloaded information than it did the working of GPS devices. In light of defendant's forfeiture, we determine that neither error nor an abuse of discretion has been established.

¶ 30    Defendant also contests Juanez's testimony as it relates to the GPS coordinates retrieved from the computer and the location of evidence recovered. According to defendant, Juanez plotted the coordinates and locations of evidence and then testified that the times and coordinates were consistent with a person walking along the same areas where the evidence was recovered and the areas covered by the recovered home security surveillance videos. Defendant argues that Juanez failed to consider issues such as timing, distance, and speed such that his opinion was unreliable and that the probative value of this testimony was outweighed by its prejudice. However, defendant failed to raise this issue in his amended motion for a new trial. Therefore, we consider the issue to be forfeited. See *Wilson*, 2017 IL App (1st) 143183, ¶ 22.

¶ 31    Defendant next contends that the trial court erred in allowing a lay witness to give expert testimony. The admission of evidence is within the sound discretion of the trial court, and we will not reverse the court's ruling absent an abuse of that discretion. *People v. Tenney*, 205 Ill. 2d 411, 436 (2002).

¶ 32    State's witness Sergeant Nick Cunningham of the Winnebago County Sheriff's office testified regarding cell towers, defendant's cell phone, and locations of various pieces of evidence recovered. According to defendant, Cunningham's testimony could only be given by an expert; as Cunningham was not qualified as an expert, the trial court erred in admitting his testimony.

¶ 33    Prior to trial, defendant filed his motion *in limine* No. 18 asserting that "the relationship of a cell phone and a cell tower involves a field of scientific study that requires the testimony of an expert witness and no such expert has been listed" by the State. Thus, defendant sought an order prohibiting the state from presenting any testimony of cell tower analysis at trial.

¶ 34    After argument, the trial court found that calling a portion of testimony a "cell tower analysis" did not elevate it to "a scientific endeavor." The trial court denied the motion, stating that defendant's arguments:

> "would go to the weight to be given to the testimony of whether [*sic*] Cunningham or
> anybody else that testifies concerning a cell tower analysis. It's going to be subject to
> foundations and basis of knowledge. Should the basis of knowledge not be there, the Court
> will sustain an objection to the testimony. If the basis of knowledge is there for said
> testimony, the Court would, of course, overrule the objection."

When asked by counsel, the court acknowledged that it considered the fact that defendant had not been given any statement of qualifications for any witness related to cell tower analysis.

¶ 35    At trial, the State presented the testimony of Stacy Kapela, a senior analyst at Verizon Wireless, through whom defendant's cellular phone records were introduced. The records included the date and time of calls, the length of calls, and the cell towers that transmitted the calls, for both outgoing and incoming calls for the target phone number. On cross-examination, Kapela was asked what the radius of a cell tower is in relation to how far away from a cell tower a person

could be for that tower to be "pinged" on a particular call. Kapela explained that it depended on the terrain and whether it was an urban or rural area; in an urban environment, it could be three to five miles. Kapela also explained that, while a phone is designed to "ping" off of the nearest tower, it was "possible" that it would not do so. Defendant did not object to Kapela's testimony.

¶ 36 Before Cunningham testified, defendant filed another motion *in limine* (No. 21) seeking an order "prohibiting the [S]tate from bringing out any evidence regarding the location of Todd Smith's phone and cell towers." Defendant argued that cell data "from a single cell tower is essentially worthless in trying to place someone in a particular location" and was "unreliable and prejudicial" because "[t]here are a variety of factors that that [*sic*] determine which tower a phone will connect to, including weather, topography, physical obstructions, tower maintenance and whether the phone is being used indoors or outside."

¶ 37 The trial court denied the motion, stating:

"We have had testimony concerning cell tower ranges, distances, whether a call goes to [the] closest one or as they are designed to do or go to other ones which they can do.

I believe that this evidence that's being tendered, the way it's being presented, would go to weight[,] not admissibility of the evidence."

¶ 38 Cunningham testified that he had received cellular records for various cell phones, including that of defendant. These records included both outgoing and incoming calls and the dates and times of the calls. They also showed which cell sites were activated by the caller and the receiver. The records also included the longitude and latitude of each cell tower, along with its physical address.

¶ 39 Cunningham testified how each cell tower had various antennae pointing in different directions, how each antenna or "sector" used a numerical azimuth to label the compass direction

in which the antenna faced (for example, "0" for true north , "90" for east, etc.) and how the azimuth is the direction of a beam/line commencing at the tower and transmitted outwards. The sector of the area is then measured 60 degrees on opposite sides of the azimuth beam/line as it radiates away from the tower. He also described the sector radius of the site as:

> "the signal strength of the equipment. It doesn't necessarily—it's not necessarily that actual coverage area. Because just because something is so powerful that it could go a certain distance doesn't mean that it in fact does. It just depends on how the antennas are arranged on the site themselves as to how far that's actually going to shoot."

When asked what type of accuracy in locating an individual's cell phone all of this provided, Cunningham responded that it could be a mile, or three miles; "[s]ometimes it's more [it] just depends where it's located." "[D]epending on the location it's going to vary how far that that antenna is going to carry transmission."

¶ 40    Cunningham then testified regarding various calls made to and from defendant's phone on various dates in October 2012. Based on the cell towers activated and the azimuth provided, Cunningham testified as to various locations that may have been within range of the site, such as defendant's house or the condo at which Katrina stayed, or locations at which Katrina's car and cell phone were found.

¶ 41    On cross-examination, Cunningham agreed that the range of each cell tower could be different and could be affected by such variables as weather and terrain. He also agreed that a person could make two calls in a row and each call would go to different cell towers. He did not know the exact location of defendant's phone when defendant made the calls that he had testified about. He also agreed that cell towers can have overlapping areas. There was nothing in the cell records that would indicate whether a cell phone was in motion. Cunningham had not written any

papers on the subject of cell towers, other than police reports, but he had presented a class for the state's attorney's office.

¶ 42 In his amended motion for a new trial, defendant contended:

> "That the court erred in denying defendant's motion in limine #18 and allowing Sargent [*sic*] Nick Cunningham to testify to cell tower location in relation to Todd Smith's phone when he had never been disclosed as an expert, he had never been qualified to testify as an expert and the data he was relying on was not a triangulation of cell towers but single cell tower data. That this testimony was prejudicial to the defendant due to the fact that he was allowed to testify to an opinion as to where the defendant was at the time of the cell tower transmission."

¶ 43 We do not find any error here. First, contrary to defendant's contention in his amended motion for a new trial, Cunningham was never allowed to opine as to where "defendant was at the time of the cell tower transmission." Cunningham did testify as to which cell tower was used for various calls to and from defendant's phone, but even he testified as to the variables in cell tower usage and power, and he specifically testified that *he did not know the exact location of defendant's phone* when defendant made the calls that he had testified about. He stated that the accuracy in locating an individual's cell phone, based on the cell tower records, could be at best a mile, maybe three miles; or "[s]ometimes it's more." The lack of pinpoint accuracy was also testified to by Kapela, who testified that a person could be three to five miles from a cell tower and still ping that tower on a call. Kapela also corroborated the variables that affected the distance.

¶ 44 Cunningham's testimony was nothing more than reading the coordinates of cell sites used in various cell phone calls, obtained from phone records, and plotting them on a map; this "is not a scientific procedure or technique." *People v. Fountain*, 2016 IL App (1st) 131474, ¶ 58.

Defendant argues that *Fountain* did not make such a holding and that the language quoted above was the State's argument in that case. However, the First District Appellate Court does not agree with defendant's argument, twice citing *Fountain* for that very holding. See *People v. Williams*, 2017 IL App (1st) 142733, ¶ 37 (*Fountain* "held that the reading coordinates of cell sites from phone records and plotting them on a map is not a scientific procedure or technique implicating *Frye*.); *People v. Wilson*, 2017 IL App (1st) 143183, ¶ 46 (preparing a map showing which cell towers phones utilized "does not qualify as scientific evidence" and quoting from *Fountain*).

¶ 45     Cunningham did provide certain technical testimony regarding azimuths and sector radii and that certain places would be within the radius of a certain tower based on that information**.** However, the variables and limitations on cell tower acquisition of a call were well established by defendant on cross-examination of both Cunningham and Kapela. Cunningham's testimony was sufficiently vague as to establish only generally that the phone was in the range of the tower not, as defendant contends, that defendant was at specific locations at specific times. We find no error here.

¶ 46     Because we have found no error pursuant to each of defendant's contentions, we need not address defendant's final contention regarding cumulative effect of error.

¶ 47                                       III. CONCLUSION

¶ 48     For these reasons, the judgment of the circuit court of Winnebago County is affirmed.

¶ 49     Affirmed.