2022 IL App (1st) 191440-U

SIXTH DIVISION
March 25, 2022

No. 1-19-1440

NOTICE: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 15 CR 11611 |
| | ) | |
| ANTWOINE BELL, | ) | Honorable |
| | ) | Ramon Ocasio, III, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE MIKVA delivered the judgment of the court.
Presiding Justice Pierce and Justice Oden Johnson concurred in the judgment.

**O R D E R**

¶ 1    *Held*: Defendant's conviction for aggravated criminal sexual abuse is affirmed where (1) inconsistencies in the witness testimony were not so substantial that the court's credibility determinations should be disregarded and (2) comments by the prosecution in its rebuttal closing argument did not improperly shift the burden of proof to defendant and were not so inflammatory as to warrant a new trial.

¶ 2    Defendant Antwoine Bell was charged by indictment with numerous counts of home invasion, aggravated criminal sexual abuse, and unlawful restraint. Following a bench trial, he was convicted on a single count of aggravated criminal sexual abuse (720 ILCS 5/11-1.60(c)(1)(i) (West 2014)) and sentenced to six years and nine months in prison. On appeal, Mr. Bell

(1) challenges the sufficiency of the evidence to support the trial court's finding of guilt and (2) argues that comments made in the State's rebuttal closing argument denied him a fair trial. For the following reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4     The State set out to prove in this case that in the early morning hours of June 19, 2015, 12-year-old A.P. was asleep in her bedroom when Mr. Bell, the 43-year-old cousin of A.P.'s stepfather, broke into her family's home and sexually abused her while the rest of the family was sleeping. According to the State, Mr. Bell entered A.P.'s bedroom with a screwdriver in his hand, sat on her bed, and proceeded to rub her breasts, touch and lick her feet, and rub her inner thighs and vagina, rebuffing A.P.'s efforts to make him stop and only leaving when noises could be heard elsewhere in the home.

¶ 5     The defense's position at trial was that the evidence against Mr. Bell came down to the testimony of a single occurrence witness, A.P., whose story was "absurd," "crazy," and so riddled with inconsistencies that it could not be believed.

¶ 6     Before trial, the court held an evidentiary hearing pursuant to section 115-10 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-10 (West 2018)). As an exception to the rule against hearsay, the court determined that the time, content, and circumstances surrounding certain "outcry" statements A.P. made to her mother and to the police on the morning after the alleged abuse took place provided sufficient safeguards of reliability to allow testimony concerning those conversations to be admitted at trial.

¶ 7                    A. The Evidence In Support of Mr. Bell's Conviction

¶ 8     The following evidence was presented at a two-day bench trial.

¶ 9                                    1. A.P.'s Testimony

¶ 10    A.P. was 16 years old at the time of trial. She testified that in June 2015 she lived with her mother, stepfather, twin stepbrothers, sister, and half-brother in a four-bedroom, single-family home in Broadview, Illinois. A.P. shared a bedroom and bunk beds with her four-year-old sister, who slept on the top bunk. Her stepbrothers' bedrooms were across the hall, and the bedroom her mother and stepfather shared was downstairs. A.P. testified that Mr. Bell, whom she identified in court, was her stepfather's cousin. He came to the family's home often, would babysit A.P. and her little sister, and was known by them as "Twan."

¶ 11    A.P. testified that on June 18, 2015, the family was up late watching a movie downstairs, but she came upstairs to bed around 11 p.m. because she had summer school the next day. Her sister did not sleep in their room that night but fell asleep on the couch in the living room. A.P. stated that she was awakened by Mr. Bell, who was sitting on her bed, "rubbing and touching on [her]," and "telling [her] to wake up, get up." When asked where Mr. Bell touched her, A.P. said, "from my arms to my leg to my thighs to my vagina." Mr. Bell told her that he was going to bring her and her brothers something from the store but would get her more because she was special, and he was going to threat her "like a queen." A.P. told him to "move" and "please stop." She also tried to move his hands away from her but was not able to, both because "[h]is hands were so strong" and because he had a screwdriver that he was moving around in one hand, and this scared her. A.P. said, "I was afraid because I thought if I screamed or say [*sic*] something, something could happen to me."

¶ 12    When asked to describe in more detail the progression of places Mr. Bell touched her, A.P. said he started at the top of her body, touching her stomach and breasts, both over and under her clothing—shorts and a T-shirt worn over underwear and a bra. He then moved to the inside of her

thighs and began rubbing her vagina, both over and under her underwear. A.P. testified that Mr. Bell whispered in her ear as he touched her, saying she was his queen, his favorite, he really liked her, he was going to make her his girl, and he was going to "treat [her] right." He also told her to be quiet so she would not wake her brothers. When she asked him to stop, he said, "[h]old on. Wait. Hold on. Wait." He rubbed her feet and began sucking her toes while looking her in the eyes.

¶ 13    A.P. asked Mr. Bell what he was doing in the house in the middle of the night, and he told her that her mother had let him in. A.P. thought it was strange that her parents would let anyone in the house at 2:30 in the morning. When asked how she knew what time it was, A.P. explained that she had her tablet in bed with her and when Mr. Bell shook her to wake her up, it came on and she noticed the time. A television was on in the room but with no volume because, according to A.P., "it was raining outside that night so the electricity took the sound off the TV."

¶ 14    The encounter ended when A.P. heard footsteps downstairs and Mr. Bell said, "I got to go." He told her he would come back the next day and asked her what she wanted from the store. Still nervous and scared, and thinking his question was "kind of weird," A.P. told him just to get her some candy.

¶ 15    A.P. testified that she did not go downstairs to tell her parents what had happened because she was not sure if Mr. Bell was still in the house. She eventually fell asleep, and in the morning, she came downstairs and confronted her mother Juanika in the kitchen, asking why she had let Mr. Bell into A.P.'s room the night before. Juanika denied letting Mr. Bell in and questioned how he would have gotten into the house. That is when A.P. told Juanika that Mr. Bell had been "feeling on [her] and stuff." She described to her mother and later to the police officer who came to their house what had happened to her. She returned to her room with the police and saw that the screwdriver Mr. Bell had had in his hand was on her dresser.

¶ 16    A.P. was interviewed some days later at Proviso Children's Advocacy Center. Although the videotape of that interview was not entered into evidence, on cross-examination, A.P. agreed that prior to her testimony at trial, she had reviewed it with an assistant state's attorney (ASA). She agreed she had told the interviewer that before he started touching her, Mr. Bell was watching her sleep "like a stalker." When asked how she could have known this, A.P. explained that she was "not a heavy sleeper" and "could feel him while he was watching [her] in [her] sleep." A.P. also told the interviewer that Mr. Bell had used the screwdriver to break into the home. When asked how she could be sure of this, A.P. explained that the windows were open the next day, though the family generally closes them at night. When asked what made her think a screwdriver was something that could be used to break into a home, A.P. explained that Mr. Bell was "a criminal" and "could have done anything." When pressed, she acknowledged that she did not know for sure that this is what happened. She agreed that seven people and a pit bull puppy were sleeping in the house on the night in question and that the house was equipped with an alarm that was triggered whenever a door was opened (though according to her the alarm did not go off when a window was opened). A.P. told the interviewer that Mr. Bell had not raped her—to her, that meant the nonconsensual penetration of her vagina with his penis—but that he had tried to and "[i]t was close." When asked how she knew what the word "rape" meant, A.P. said that kids had used it around her when she was younger, and she had looked it up.

¶ 17    Defense counsel also cross-examined A.P. regarding the ways in which Mr. Bell had touched her. A.P. indicated that he had cupped her breasts but not squeezed them. When asked why she told her mother and the police officer that Mr. Bell woke her by shaking her arm but told the child advocacy interviewer that he woke her by rubbing her thigh, she explained that he had done both: "[h]e was shaking my arm and rubbing my thigh." She testified that he put the

screwdriver down on the bed to touch her with both hands and at one point tried to raise her arms above her head and lay on top of her.

¶ 18     When asked if Mr. Bell put his fingers in her vagina, A.P. said yes, both over and under her underwear. He put his finger in her vagina through her underwear and another time he went inside her underwear with his bare finger. A.P. agreed that she had told the interviewer that Mr. Bell "was rubbing his fingers on [her] underwear and getting in [her] underwear to [her] vagina," but not that he had stuck his finger in her vagina. She said, however, that she had told the police officer this.

¶ 19     A.P. agreed that everything she described at trial and to the child advocacy interviewer had taken place over approximately 30 minutes. She told the interviewer that she demanded Mr. Bell stop what he was doing, or she would tell her parents, prompting him to ask her if she was really going to treat him like that. She also told the interviewer that Mr. Bell asked her for a hug before he left but she refused to give him one. A.P. denied telling the interviewer she had in fact hugged Mr. Bell in an effort to get him to leave. She agreed that she had not told the police officer that Mr. Bell left because he heard footsteps, though she had told this to the interviewer. But a moment later, she reconsidered and maintained that she had told the officer this. When asked if the volume on the television downstairs was working, even though she had said that the weather had caused the sound to go out on the television in her room, A.P. agreed, saying, "[r]ight. Exactly."

¶ 20     On re-direct, A.P. reiterated that she did not feel safe when she woke to find Mr. Bell in her bedroom, that she did not want any of the things that happened that night to happen to her, and that the screwdriver in Mr. Bell's hand made her feel "endangered" and "like something was going to happen to [her]." A.P. said she talked to her mother for about an hour the next morning before Juanika called 9-1-1. She then talked to the police officer who responded to the call for "[n]ot too

long." She agreed that her interview at the children's advocacy center was conducted in private and lasted for a much longer period of time.

¶ 21                                     2. What A.P. Told Her Mother

¶ 22    A.P.'s mother, Juanika, testified that she was separated pending divorce from A.P.'s stepfather. She testified that her husband had brought Mr. Bell into their home, and she had trusted Mr. Bell and thought of him as family. In June 2015, she had known Mr. Bell for around five years.

¶ 23    On the morning of June 19, 2015, she woke up and was getting the kids ready for summer school. Juanika went into the girls' room and A.P. and her sister were both there, with the television on and the volume on "medium." A.P., who was already awake, turned around to face Juanika and "looked like she saw a ghost." A.P. asked Juanika why she had let Mr. Bell in the house last night. Juanika denied letting Mr. Bell into the house and said she knew right away from the expression on A.P.'s face that something was wrong. A.P. told her that Mr. Bell had been in A.P.'s room and that he "was touching on [her] leg," went "under [her] shorts," and "started touching [her] vagina and *** sticking his finger in [her]." A.P. told her mother how Mr. Bell "was talking to her, telling her to be quiet, that she was going to be his favorite one," and that he "was going to give her extra sweets and candy." At one point he put his hand over A.P.'s mouth and told her "to shhh." According to Juanika, A.P. stayed awake all night, scared that Mr. Bell would return.

¶ 24    Juanika testified that upon learning this she "freaked out" and had to use her asthma inhaler to catch her breath and think about what to do, ultimately deciding to call the police. The officer who responded spoke to A.P. and Juanika together. Juanika then agreed to take A.P. to a children's advocacy center for a professional interview. When asked if, at any time, she had told A.P. what to say to the officer or the interviewer, Juanika said no, that she "couldn't talk" and "was too busy crying."

¶ 25    On cross-examination, Juanika testified that she had talked to both of her daughters about men touching them inappropriately and had made it clear to them that they must tell her if this ever happened. She did not use the word rape with them. Juanika denied that A.P. called Mr. Bell "Twan," explaining that only his own family called him that. Juanika maintained that A.P. had told her Mr. Bell "kept trying to stick his finger in [her]" and that it hurt because his fingernails were "cutting the walls of her vagina." She acknowledged that there was no blood, however, on A.P.'s clothes or on the bed. Juanika was sure that Mr. Bell had his penis out and was prepared to penetrate A.P. when he heard someone moving around downstairs. Juanika recalled that A.P.'s stepfather had gotten up in the middle of the night and went to the bottom of the stairs to "look at the blinds because they looked like somebody had messed with them and the window." Juanika explained that she had worked at one time as an armed security guard for the Chicago Housing Authority and was careful to check before she went to bed to make sure all of the doors and windows were locked. The only window in their house that did not lock was in the stairwell. Juanika testified that the family had no pets at the time in question.

¶ 26                      3. What A.P. Told the Police

¶ 27    The parties stipulated that, if called to testify, Sergeant Michael Akim of the Broadview Police Department would give the same testimony on direct examination by the State that he provided at the section 115-10 hearing earlier that morning. Sergeant Akim's testimony at that hearing was that he arrived at A.P.'s home shortly after 9 a.m. on June 19, 2015, and initially spoke to A.P.'s mother and stepfather in their living room. A.P. was present, as was an officer who had taken an initial report from the family. Sergeant Akim described 12-year-old A.P. as "very articulate and well spoken." She told him that she had gone to bed at 11 p.m. the night before and had awoken to find her cousin, Mr. Bell, next to her on the bed and shaking her arm. A.P. asked

Mr. Bell what he was doing there, and he told her that her parents had let him into the house. She noticed a yellow and black screwdriver lying on the bed next to his leg. Mr. Bell told A.P. that he had candy for her and her brothers but that he would give her more and that she was "[his] everything." He rubbed her feet and legs and put his hand underneath her shorts and began rubbing her inner thigh near her vagina. A.P. told Sergeant Akim that Mr. Bell did not put his fingers inside her private parts. She slapped Mr. Bell's hand and told him to stop, at which point he put his hand under her T-shirt and began rubbing her stomach and chest. She again knocked his hand away and told him to stop, saying she would tell her parents. Mr. Bell got up then, said "something along the lines of: Why would you do that to me?" and asked A.P. to give him a hug. She refused but he asked again, and she hugged him to make him leave. A.P. remained lying on the bed but had trouble falling asleep because she was scared. She eventually did fall asleep, and when she woke up the next morning, told her mother what had happened.

¶ 28    Called as a witness at trial by the defense, Sergeant Akim agreed that in the report he made that day, he indicated that both Juanika and A.P. referred to Mr. Bell as "Twan." Following his interview, he collected the screwdriver found on A.P.'s dresser from Juanika, who had already moved it from that location with her bare hands and looked for but did not find any signs of forced entry. He did not believe that he asked Juanika if the home was equipped with an alarm system, and she did not tell him that it was. In discussing how Mr. Bell may have entered the home, Juanika "mentioned a window in the north-east side of the house" and also commented that "the children may have left the doors unlocked."

¶ 29    Sergeant Akim said that A.P. appeared emotional but was not crying. He saw no signs of injuries on her and she reported none to him. A.P. did not tell him that Mr. Bell planned on coming back the next day, that he exposed his penis to her, or that he inserted his fingers in her vagina and

cut the walls of her vagina with his fingernails.

¶ 30 On cross-examination by the State, Sergeant Akim explained that his interview of A.P. lasted approximately 20 minutes. Other people were present. He asked A.P. only open-ended questions. He did not ask her if Mr. Bell had penetrated her in any way and did not call on her to describe in more detail what had transpired. As Sergeant Akim explained at the section 115-10 hearing, the protocol he followed was "to get basic information" and then schedule a "a Victim Sensitive Interview *** so a professional [could] interview the child."

¶ 31                          4. What A.P.'s Stepbrother Heard and Saw

¶ 32 A.P.'s stepbrother Martez, who was 14 years old at the time of trial, testified consistently with A.P. regarding the layout of the family home, who lived there in June 2015, and Mr. Bell's relationship to the family. Although Martez and his twin brother Cortez each had his own bedroom, on the night in question Cortez was sleeping in Martez's room because Cortez's television was broken. At some point in the night, Cortez kicked Martez, causing Martez to fall off the bed. As he got back into bed, half awake, Martez heard A.P. say "[g]et off me" and "stop." He only heard her say this one time and assumed she was talking to her younger sister, whom she shared a bedroom with. It was only when he woke up the next day that Martez learned something had happened to A.P. A few days later, he was taken to "a place where they interview kids" to describe what he had heard that night.

¶ 33 Martez testified that Mr. Bell would sometimes bring the kids candy and A.P. always received more candy than the others. One day, A.P. came outside to tell the boys that Mr. Bell had candy for them and, when they went inside to get it from him, Martez noticed that Mr. Bell was distracted because he was staring at A.P., at her "private part in the front area," and biting his lip. Martez recalled having to get Mr. Bell's attention before he would distribute the rest of the candy.

¶ 34                                5. The Physical Evidence

¶ 35    The parties stipulated that, if called as a witness at trial, an expert in the field of latent fingerprint analysis would testify that no latent impressions suitable for comparison were retrieved from the screwdriver found in A.P.'s room.

¶ 36                                B. Closing Arguments

¶ 37    In its closing argument, the State walked through the ways that the testimony of Juanika and Martez corroborated A.P.'s account of what happened to her on June 19, 2015, and reminded the court that, even absent such corroboration, the testimony of a single credible witness was sufficient to convict. Any inconsistencies regarding where Mr. Bell touched A.P., the prosecutor argued, were understandable because "his hand was all over her" and A.P. "[told] it the best way that she [could]." The prosecutor urged the court "not to get tied down in semantics"; the vagina was "a complex thing" with inner and outer parts and the State did not need to prove penetration to prevail.

¶ 38    In her own closing, defense counsel painstakingly walked the court through 41 purported inconsistences in the witness testimony, accused A.P. of "speculating and coming to her own conclusions" and Juanika of "insert[ing] facts into this case that [A.P.], herself, never testified to." Counsel argued that Mr. Bell was "not stupid," and it was simply not reasonable to conclude that he had broken into a home, whether it was equipped with an alarm system or not, through a window while seven people (including Juanika, who had worked as an armed security guard) and a pit bull were inside, and the television was on—and had then left his burglary tool behind. Defense counsel urged the court to recall "how [A.P.]'s demeanor changed when [counsel] asked her if she knew she could get in trouble" if she did not tell the truth in court. Counsel claimed to have seen "a tear come out of [A.P.'s] eye" and noted that she had needed a drink of water. Counsel represented to

the court that "[t]hat was the only time throughout her testimony that [A.P.] behaved in that way" or showed any emotion.

¶ 39    In rebuttal, the State called defense counsel's catalog of inconsistencies "knit-picking" that was presented to give "the appearance of impeachment" where there was, at best, impeachment by omission, and accused defense counsel of "grasping at straws." After reiterating how the witness testimony established Mr. Bell's guilt, the prosecutor argued that the defense had presented no evidence that A.P. or her mother had any motivation to lie:

"MS. O'BRIEN [(ASA)]: My burden, Judge, is to prove beyond a reasonable doubt that Antwoine Bell committed the offenses of home invasion and aggravated criminal sexual abuse against [A.P.]. That's my burden. And I have met that burden.

Where is the reasonable doubt, Judge? Where is the plausible scenario, the plausible explanation for this girl to immediately tell her mom and talk to police officers? Where is the plausible explanation for Juanika [ ] to call the police? Where is the plausible explanation for Juanika [ ] to give a screwdriver to the police to be tested for the defendant's fingerprints? Where is the plausible explanation—

MR. WALSH [(defense counsel)]: Objection.

THE COURT: Overruled.

MS. O'BRIEN: —that explains why Juanika [ ]'s finger prints—

MR. WALSH: Objection. The defendant has no burden to explain or prove anything.

THE COURT: I agree with that.

MS. O'BRIEN: And I'm not implying that that's up to the defendant, Judge. But I am implying that these are things that need to be considered by the trier of fact in

determining is there—

    MS. CRUZ [(defense counsel)]: Objection, Judge.

    MS. O'BRIEN: — reasonable doubt. There are no explanations because the victim did not lie. What's her motive? What's her bias? What's her prejudice?"

¶ 40    Regarding whether a reasonable person would have tried to enter the family's home that night, the ASA said the following:

    "MS. O'BRIEN: I want to start first with the explanations proposed by the defendant of why [Mr. Bell] never would have done this.

    He never would have gone into a house with 7 people and a Pitbull and televisions on and an armed officer and maybe a security system ***.

    He never would have done this, but, Judge, we're here governed by reasonableness. That's a tenant that governs everything we do. And the defendant is a sex offender. And sex offenders—

    MS. CRUZ [(defense counsel)]: Objection.

    MR. WALSH [(defense counsel)]: Sidebar?

    THE COURT: Well—go ahead.

    MS. O'BRIEN: —aren't reasonable individuals.

    He broke into that house that night with the intent to commit a sex offense on [A.P.]. That's not reasonable.

    So to say would he go for it. Would he try to do this wouldn't he be scared off? He's not reasonable. He's not thinking that way."

¶ 41    And on the subject of A.P.'s demeanor while testifying, the ASA stated:

    "MS. O'BRIEN: To say to a little girl who's going to come into this room with

people sitting here, a room full of strangers, and is going it have to talk about her vagina. Is having to have to talk about her breasts. And one of the first questions posed to her is, do you know you could get in trouble for what you're about to do—

MS. CRUZ: Objection.

THE COURT: Overruled.

MS. O'BRIEN: That is terrible. Given the burden that this little girl carried on her shoulders when she took that witness stand; to come in and talk in front of a room full of strangers. And then for the defendant to watch her to demonstrate—to demonstrate from the witness stand how it is she was touched. To ask the victim of a sex crime to victimize herself in a courtroom. Any method to get out from under the weight of the evidence and the weight of his crime.

[A.P.] is not on trial in this courtroom. She is not the one who has done something wrong. She is not a liar. She is not a criminal. That's right over there. (indicating)

MS. CRUZ: Objection.

THE COURT: Overruled."

¶ 42                                    C. The Court's Ruling

¶ 43    The court determined that the State had proved beyond a reasonable doubt that Mr. Bell, who was over the age of 17, had touched A.P.'s breasts through her clothing for purposes of sexual arousal or gratification when A.P. was under the age of 13. The court found Mr. Bell not guilty of all other charges, including home invasion, aggravated unlawful restraint, and charges of aggravated criminal sexual abuse predicated on his touching A.P.'s sex organ through her clothing, touching her foot with his tongue, or displaying the screwdriver as a dangerous weapon.

¶ 44    The trial judge addressed Mr. Bell directly, explaining his ruling as follows:

"The lynch pin of the State's case is the testimony of a young girl who testified that on June 19th, 2015, you, an extended family member, a cousin to her stepfather, came into her room *** and proceeded to commit acts of sexual conduct. The next morning [A.P.] reports this incident to her mother. And upon hearing of this, the mother immediately contacts 911. Shortly thereafter the Detective Mike Akim conducts a preliminary interview of [A.P.], and while fresh in [her] mind, [A.P.] describes to Detective Akim sexual conduct which he attributed to you.

While I agree that [A.P.] filled in details when perhaps the answers to some of her questions should have been I don't know or I don't remember; I do find that she is a credible witness."

¶ 45    The court denied Mr. Bell's motion for a new trial.

¶ 46    Aggravated criminal sexual abuse is a Class 2 felony, but the State argued at sentencing, and defense counsel agreed, that Mr. Bell's prior felony convictions required him to be sentenced as a Class X offender to a minimum of six years in prison. The court imposed a sentence of six years and nine months.

¶ 47                              II. JURISDICTION

¶ 48    The trial court sentenced Mr. Bell on June 28, 2019, and he timely filed a notice of appeal from the judgment against him that same day. We have jurisdiction over this appeal under article VI, section 6, of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6) and Illinois Supreme Court Rules 603 (eff. Feb 6, 2013) and 606 (eff. July 1, 2017), governing appeals from final judgments in criminal cases.

¶ 49                              III. ANALYSIS

¶ 50    On appeal, Mr. Bell argues that (1) the evidence against him was insufficient to sustain a

guilty verdict, and (2) prosecutorial misconduct in closing arguments denied him a fair trial. We address each argument in turn.

¶ 51                              A. Sufficiency of the Evidence

¶ 52    We first consider Mr. Bell's argument that the State failed to prove beyond a reasonable doubt that he was guilty of aggravated criminal sexual assault. When a criminal defendant challenges the sufficiency of the evidence that resulted in his conviction, our function is not to retry the defendant. *People v. Collins*, 106 Ill. 2d 237, 261 (1985). Rather, "after viewing the evidence in the light most favorable to the prosecution," we must determine whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.) *Id.* The positive and credible testimony of a single witness is sufficient to convict, and we will not overturn a conviction on review "unless the evidence is so improbable or unsatisfactory as to create a reasonable doubt of the defendant's guilt." *People v. Siguenza-Brito*, 235 Ill. 2d 213, 225, 228 (2009). We afford great deference to the trial court's credibility determinations because it "is in a superior position to determine and weigh the credibility of the witnesses, observe the witnesses' demeanor, and resolve conflicts in their testimony." *People v. Richardson*, 234 Ill. 2d 233, 251 (2009).

¶ 53    Mr. Bell insists that A.P.'s various accounts of what happened to her—her testimony at trial, what she told her mother, what she told the police, and what she told the child advocacy interviewer—were "riven with contradictions," "incurably confused," and so "replete with *** discrepancies" that no rational factfinder could have found him guilty beyond a reasonable doubt of aggravated criminal sexual abuse. We disagree. Although reversal is appropriate where testimony is "so lacking in credibility that a reasonable doubt of defendant's guilt remains" (*People v. Schott*, 145 Ill. 2d 188, 207 (1991)), "minor discrepancies in testimony do not render it unworthy

of belief and affect only the weight to be given such testimony." *People v. Roper*, 116 Ill. App. 3d 821, 824 (1983).

¶ 54    In contrast to the hyperbolic characterizations of A.P.'s testimony in Mr. Bell's brief, our own review of the record reveals that her testimony at trial was in fact substantially consistent with what, according to those witnesses, she told her mother and the police the morning after the abuse took place. She woke up to find Mr. Bell lying next to her on the bed. He told her that her parents had let him into the house. He had a screwdriver in his hand at first but put it down as he touched her. He praised her and told her she was special as he touched her breasts, feet, legs, and vagina, both over and under her clothing. She told him to stop. He did not. She tried but failed to push or slap his hands away. And when Mr. Bell finally left, A.P. was scared he was still in the house and stayed in her room until morning.

¶ 55    There were of course some discrepancies, notably whether Mr. Bell penetrated A.P.'s vagina with his finger and what precisely caused him to leave A.P.'s room. A.P. testified at trial that Mr. Bell digitally penetrated her, both through her underwear and with his bare finger. This is consistent with Juanika's testimony that A.P. told her Mr. Bell "started touching [her] vagina and *** sticking his finger in [her]." Although A.P. stated that this was what she had also told the police, Sergeant Akim recalled her telling him that Mr. Bell "did *not* put his fingers inside her private parts." (Emphasis added.) And A.P. acknowledged on the stand that she told the child advocacy investigator that Mr. Bell "was rubbing his fingers on [her] underwear and getting in [her] underwear to [her] vagina," but not specifically that he had penetrated her vagina with his finger. However, her account as a whole as to the events that unfolded remained consistent.

¶ 56    A.P. also testified that Mr. Bell left her room, saying "I got to go," shortly after she herself heard footsteps downstairs. She said he told her he would come back the next day and bring her

candy. Sergeant Akim's recollection, however, was that A.P. told Mr. Bell she was going to tell her parents if he did not stop, prompting him to say, "[w]hy would you do that to me?" and ask her to give him a hug before he left, a request A.P. complied with only to get him to leave.

¶ 57    The trial judge was well aware of these and other inconsistencies and concluded that they did not detract from A.P.'s overall credibility. While the judge "agree[d] that [A.P.] filled in details when perhaps the answers to some of her questions should have been I don't know or I don't remember," he specifically found her to be a credible witness. Mr. Bell fails to provide us with a basis for disturbing this assessment by the finder of fact.

¶ 58    Other discrepancies have reasonable explanations. A.P. testified that her younger sister fell asleep on the couch that night and did not sleep in their shared bedroom. Juanika, however, testified that when she went to the girls' room to wake them, they were both already awake, and A.P.'s sister was in the top bunk. But A.P.'s sister could certainly have come to the room any time between approximately 3 a.m. when, according to A.P., Mr. Bell left the room, and when Juanika entered it to wake the girls for summer school. A.P. also testified that she gave her "outcry" statement to Juanika downstairs in the kitchen, whereas Juanika said this occurred in the girls' upstairs bedroom. But the conversation, which lasted for approximately one hour, surely could have begun in one area of the home and ended in another. As a court of review, we "must allow all reasonable inferences from the record in favor of the prosecution." *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004). Here, reasonable explanations exist for the claimed inconsistencies between the testimony of A.P. and her mother.

¶ 59    The court may also have found that some details—like whether Mr. Bell took out his penis during the encounter—were embellishments attributable to Juanika, a distraught mother who was sure her daughter had been seconds away from being raped and was perhaps a bit defensive, lest

anyone think she had not done everything possible to protect her daughter.

¶ 60    Finally, many of the "inconsistencies" Mr. Bell points out are also not truly inconsistencies at all, but simply instances where A.P. included a particular detail in one account but not in another. He points out, for example, that A.P. "told only [Sergeant] Akim that she slapped [Mr.] Bell's hand and only Juanika that he put his hand over her mouth." Impeachment by omission occurs where "it is shown that the witness had the opportunity to make a statement about the omitted facts and, under the circumstances, a reasonable person ordinarily would have included the facts." *People v. McWhite*, 399 Ill. App. 3d 637, 642 (2010). But it makes sense, in our view, that the details a young girl would share in an outcry statement made to her mother might differ in some respects from those made to a male police officer conducting a preliminary interview, those shared with a trained interviewer in a private setting over a longer period of time, and those testified to in open court as evidence in an official proceeding. We find nothing unreasonable about A.P.'s inclusion of certain details in one retelling but not in another.

¶ 61    Mr. Bell cites two cases for the proposition that this court "has not hesitated to reverse convictions outright when they rest on unbelievable testimony." This is of course true, but as examples these cases present unusual fact patterns that have little relevance here.

¶ 62    In *People v. Herman*, 407 Ill. App. 3d 688, 704–05 (2011), the complainant, a confessed drug addict, testified that she was raped by a Chicago police officer. The defendant admitted to having sex with the complainant but testified that the act was consensual and took place when he was not on duty. *Id.* According to the complainant, after smoking six to eight rocks of cocaine she was induced by the defendant to go with him in his squad car to her home, where he sexually assaulted her; when she reported the incident, she claimed she was belittled by the police officers, offered bribes of alcohol and money to go away, and made to participate in a reenactment of the

assault in which her attorney took photographs. *Id.* The complainant also changed her timeline of events numerous times before and during trial, in some cases stating that the encounter occurred when the defendant could not have been at her apartment. *Id.* at 706.

¶ 63    In *People v. Williams*, 383 Ill. App. 3d 596, 637-38 (2008), this court's review of the record revealed that the "only evidence linking [the] defendant to culpable involvement" in that crime was the "hesitant testimony" of two children elicited "after substantial prodding through vigorous leading questions." That testimony, we noted, was vague, "riddled with internal inconsistencies and self-contradictions," and impeached by other testimony and evidence. *Id.* at 638. Given these serious problems, we concluded that the testimony was "substantially unreliable and too tenuous to sustain the trial court's finding of guilt." *Id.* The discrepancies in the witness testimony in *Williams* "were major, rather than minor" and "materially essential to the identification of defendant" as a participant in the crime. *Id.* at 643.

¶ 64    The witness testimony in this case was not perfect. It rarely is. But in contrast to these cases, any inconsistencies were minor, and nothing suggested any motive for witnesses to fabricate claims against the defendant. As we explained in *People v. Garcia*, 2012 IL App (1st) 103590, ¶ 84, "[a] complainant's testimony need not be unimpeached, uncontradicted, crystal clear, or perfect in order to sustain a conviction for sexual abuse." (Internal quotation marks omitted.) Where minor inconsistencies "do not detract from the reasonableness of [the witness's] story as a whole," the testimony is adequate to support a conviction. Collectively, and viewed in the light most favorable to the State, the evidence in this case was sufficient to convict Mr. Bell of aggravated criminal sexual abuse.

¶ 65                                    B. Prosecutorial Misconduct

¶ 66    Mr. Bell also argues that in its rebuttal closing argument, the State improperly attempted

to shift the burden of proof to him and made inflammatory statements referring to him as a "sex offender" and a "criminal." Mr. Bell insists that, in overruling his objections to this prosecutorial misconduct, the trial court telegraphed its acceptance of them, thereby denying him a fair trial.

¶ 67    The parties dispute whether defense counsel adequately preserved these arguments for appeal. Unpreserved errors are considered under the plain-error doctrine; preserved errors, in contrast, are subject to a harmless-error analysis. *People v. Thompson*, 238 Ill. 2d 598, 611 (2010). In either case, however, the first question is whether any error occurred at all, because "there can be no plain error if there was no error." *People v. Wilson*, 2017 IL App (1st) 143183, ¶ 25. Here, it is clear from the record that the challenged comments were within the range of what can be considered as appropriate responses by the State to defense counsel's arguments.

¶ 68    In this area, a few guiding principles are well-established. First, the State is afforded a great deal of latitude in closing argument. *People v. Nieves*, 193 Ill. 2d 513, 532 (2000). It " 'may comment on the evidence and any fair, reasonable inferences it yields.' " *People v. Phillips*, 392 Ill. App. 3d 243, 275 (2009) (quoting *People v. Nicholas*, 218 Ill. 2d 104, 121 (2005)). To constitute reversible error, a remark must have resulted in substantial prejudice to the defendant. *People v. Flax*, 255 Ill. App. 3d 103, 109 (1993). The test for this is whether the remark was a material factor in the defendant's conviction or whether the trier of fact would have reached a different verdict had the State not made the remark. *Id.* We must consider any allegedly improper remarks not only within the full context of the closing arguments (*People v. Cisewski*, 118 Ill. 2d 163, 176 (1987)), but also in light of all the evidence presented against the defendant at trial (*Flax*, 255 Ill. App. 3d at 109). "Absent deliberate misconduct, incidental and uncalculated remarks" generally provide no basis for reversal. *People v. Cloutier*, 156 Ill. 2d 483, 507 (1993).

¶ 69    We find the ASA's repeated demand in rebuttal closing argument for a "plausible

explanation" was not, as Mr. Bell insists, an effort to shift any burden of proof to the defense. The ASA made these statements after setting out how the State had *already met its burden*, through the testimony of A.P. and her mother. The ASA was entitled to point out that no evidence had been presented by either the State or the defense at trial suggesting that either witness had any motivation to falsely accuse Mr. Bell. The statements, taken in context, were not improper, and the record reflects that the trial judge understood them as they were intended.

¶ 70    We also find no reversible error in the State's brief references to Mr. Bell as a criminal and as a sex offender. These two statements were isolated and not made in the State's opening argument but in its rebuttal, in specific reference to arguments made by the defense. The ASA referred to Mr. Bell as a criminal in response to defense counsel's argument that A.P. became nervous on the stand when reminded that she could get in trouble if she did not tell the truth. The prosecutor responded that A.P. was not the one on trial and was not the criminal, Mr. Bell was. The ASA referred to Mr. Bell as a sex offender specifically in response to defense counsel's argument that a rational person would not have broken into the house in the manner alleged. The State's response was that the sexual assault of a child is not a rational crime and since Mr. Bell was a sex offender there was no reason to assume he would act rationally.

¶ 71    It is well-settled that a prosecutor may respond to an argument from defense counsel that provokes a response (*People v. Cosmano*, 2011 IL App (1st) 101196, ¶ 63 (citing *People v. Hudson*, 157 Ill. 2d 401, 444 (1993))), and a provoked response cannot form the basis of a claim that the defendant was denied a fair trial (*People v. Davis*, 2018 IL App (1st) 152413, ¶ 80 (citing *People v. Evans*, 209 Ill. 2d 194, 225 (2004))). Here, it was fair for the State to respond both to defense counsel's suggestion that A.P. exhibited signs of a guilty conscience while testifying and counsel's insistence that the crime that was alleged to have occurred was not rational.

¶ 72    Moreover, these arguments must also be examined in light of the fact that this was a bench trial. There was no jury to shield from improper statements, and the court itself was quite capable of distinguishing between proper and improper argument. See *People v. Gholston*, 124 Ill. App. 3d 873, 887 (1984) (noting that in a bench trial "it is presumed that the trial court will disregard all improper arguments by counsel" (internal quotation marks omitted)). Mr. Bell has failed to convince us that anything the State said in its closing arguments prejudiced him at trial.

¶ 71                                   IV. CONCLUSION

¶ 72    The evidence presented against Mr. Bell in this case sufficiently supported his conviction for aggravated criminal sexual abuse. Comments made by the State in its rebuttal closing argument were not improper, did not prejudice Mr. Bell in this bench trial, and do not require reversal. We affirm Mr. Bell's conviction.

¶ 73    Affirmed.